PPG INDUSTRIES, INC., Plaintiff,

v.

UNITED STATES, Defendant,

Vitro Flotado, S.A. and Vidrio Plano de Mexico, S.A., Defendants-Intervenors.

Court No. 84-3-00411.

United States Court of International Trade.

May 15, 1987.

Stewart & Stewart (Eugene L. Stewart, Washington, D.C., on the motion), for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch; (A. David Lafer, Washington, D.C., on the motion), for defendant.

Brownstein, Zeidman & Schomer (Irwin P. Altschuler and David R. Amerine, Washington, D.C., on the motion), for defendants-intervenors.

## MEMORANDUM OPINION

CARMAN, Judge:

Plaintiff moves pursuant to Rule 56.1 of the Rules of this Court for judgment upon the agency record challenging the suspension of a countervailing duty investigation of unprocessed float glass (float glass) from Mexico. *Unprocessed Float Glass From Mexico; Suspension of Countervailing Duty Investigation,* 49 Fed.Reg. 7264 (Feb. 28, 1984). Plaintiff also challenges certain determinations made by the International Trade Administration (ITA) pursuant to the final affirmative countervailing duty determination. *Unprocessed Float Glass From Mexico; Countervailing Duty Determination,* 49 Fed.Reg. 23097 (June 4, 1984).

For the reasons stated below, this Court holds the ITA's determination is supported by substantial evidence on the record and is otherwise in accordance with law.

## FACTS

PPG Industries, Inc. (PPG), a domestic manufacturer of float glass petitioned the ITA on behalf of the United States float glass industry. PPG alleged that certain benefits constituting bounties or grants within the meaning of the Tariff Act of 1930 (Tariff Act) § 303, 19 U.S.C. § 1303 were being provided directly or indirectly to Mexican manufacturers, producers, or exporters of float glass exported to the United States.[1] Since Mexico was not "a country under the Agreement" within the meaning of § 1671(b),[2] § 1303 applied to the investigation. Because the product was dutiable, the United States International Trade Commission (ITC) was not required to determine whether imports of the product caused or threatened to cause material injury to a United States industry.

Upon finding sufficient grounds, the ITA initiated a countervailing duty investiga-

---

1. Float glass is a type of flat glass that is produced by floating molten glass over a bed of molten tin. It was imported under Items 543.2100 and 543.6900 of the Tariff Schedules of the United States (TSUS). The period covered by the investigation for measuring the bounties or grants was January 1 to September 30, 1983. *See Unprocessed Float Glass From Mexico; Preliminary Affirmative Countervailing Duty Determination,* 48 Fed.Reg. 56095 (Dec. 19, 1983).

2. Congress has defined a "country under the Agreement" to mean a country:

    (1) between the United States and which the Agreement on Subsidies and Countervailing Measures applies, as determined under section 2503(b) of this title,

    (2) which has assumed obligations with respect to the United States which are substantially equivalent to obligations under the Agreement, as determined by the President, or

    (3) with respect to which the President determines that—

    (A) there is an agreement in effect between the United States and that country which—

    (i) was in force on June 19, 1979, and

    (ii) requires unconditional most-favored-nation treatment with respect to articles imported into the United States,

    (B) the General Agreement on Tariffs and Trade does not apply between the United States and that country, and

    (C) the agreement described in subparagraph (A) does not expressly permit—

    (i) actions required or permitted by the General Agreement on Tariffs and Trade, or required by the Congress, or

    (ii) nondiscriminatory prohibitions or restrictions on importation which are designed to prevent deceptive or unfair practices.

19 U.S.C. § 1671(b).

tion. It was preliminarily determined by the ITA that certain benefits which constituted bounties or grants within the meaning of the Tariff Act were being provided to manufacturers, producers, or exporters of float glass from Mexico. The preliminary determination found a net bounty or grant of 1.63% *ad valorem.* The Mexican program that was determined by the ITA to confer countervailable benefits was the Fund for the Promotion of Exports of Mexican Manufactured Products (FOMEX). The ITA directed the U.S. Customs Service to suspend liquidation and require a cash deposit or the posting of a bond on the entries in an amount equal to the estimated net bounties or grants. *Unprocessed Float Glass From Mexico; Preliminary Affirmative Countervailing Duty Determination,* 48 Fed.Reg. 56095 (Dec. 19, 1983).

In a notice containing the preliminary determination, the ITA terminated and rescinded the initiation of the investigation of preferential prices on natural gas used by the domestic industries and Certificates of Fiscal Promotion (CEPROFIs) granted for wage increases and for investment in new Mexican-made capital goods because the ITA had determined in prior investigations that these programs were not countervailable. The ITA also noted that no further information causing the ITA to review this decision was received.

On February 28, 1984, the ITA suspended the countervailing duty investigation. The basis for the suspension was an agreement between the ITA and the defendant-intervenors, Vitro Flotado, S.A. (Vitro or Vitro Flotado) and Vidrio Plano de Mexico, S.A. (Vidrio or Vidrio Plano), the only known manufacturers and exporters of float glass to the United States from Mexico. The intervenors renounced completely all benefits provided by the government of

Mexico which the ITA found constituted bounties or grants on float glass. 49 Fed. Reg. 7264.

Although the ITA and defendant-intervenors had previously entered into a suspension agreement, the ITA had continued the investigation pursuant to 19 U.S.C. § 1671c(g) at the behest of the plaintiff. On June 4, 1984, the ITA published a final countervailing duty determination for float glass from Mexico. It determined certain benefits which constituted bounties or grants within the meaning of § 1303 were being provided to manufacturers, producers, or exporters in Mexico of float glass. The net bounty or grant was found to be 2.54% *ad valorem.* The ITA indicated the suspension agreement would remain in force and no countervailing duty order would issue unless there was a violation of the agreement or the ITA determined it no longer met the requirements of sections 704(b) and (d) as provided in section 704(i) of the Tariff Act. *See* 49 Fed.Reg. 23097.

In the final affirmative duty determination the ITA found that the Fund for the Promotion of Exports of Mexican Manufactured Products (FOMEX) conferred an *ad valorem* benefit of 1.52%. FOMEX is a trust established by the government of Mexico to promote the manufacture and sale of exported products. The ITA also determined that CEPROFIs conferred an *ad valorem* benefit of 1.02%. CEPROFIs were tax credits used to promote National Development Plan (NDP) goals which include increased employment, encouragement of regional decentralization, and industrial development, in particular, of small and medium sized firms.

The ITA also determined that the Trust Fund for Coverage of Risks (FICORCA) did not confer a countervailable bounty or grant.[3] The ITA also determined that the

---

**3.** The ITA also determined that the following programs were not used by Mexican float glass companies exporting to the United States:
  A. Import Duty Reductions and Exemptions;
  B. Extra-CEDIs;
  C. Discounts and Rebates on Energy Used by the Float Glass Industry;
  D. Preferential Prices on Natural Gas Used by the Float Glass Industry;
  E. Article 94 Loans;
  F. Fund for Industrial Development (FONEI);
  G. Guarantee and Development Fund for Small and Medium Industries (FOGAIN);
  H. Mexican Institute for Foreign Trade (IMCE);
  I. Trust for Industrial Parks, Cities, and Commercial Centers (FIDEIN);

program for the Certificado de Devolucion de Impuesto (CEDI) was suspended. The agency indicated that if the program were subsequently reactivated, the Department would review its applicability in an administrative review under section 751 of the Tariff Act.

## BACKGROUND

This case concerns the ITA's interpretation of § 1303 in the context of certain alleged countervailable benefits provided by the Mexican government to its float glass industry. Section 1303 provides in pertinent part:

(a)(1) Except in the case of an article or merchandise which is the product of a country under the Agreement (within the meaning of section 1671(b) of this title), whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation, shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, then upon the importation of such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant, however the same be paid or bestowed.

19 U.S.C. § 1303. By its terms, section 1303 applies only in the case of a product from a country which is not a "country under the Agreement" within the meaning of 19 U.S.C. § 1671(b). In general, § 1303 applies to a country that is not obliged to comply with the Agreement on Subsidies and Countervailing Measures. Since Mexico was not a "country under the Agreement" at the time of the investigation, section 1303 is applicable in this review.

Section 1671 provides the basic framework for levying countervailing duties on merchandise when there is a "country under the Agreement:"

(a) **General rule.—If—**

(1) the administering authority determines that—

(A) a country under the Agreement, or

(B) a person who is a citizen or national of such a country, or a corporation, association, or other organization organized in such a country,

is providing, directly or indirectly, a subsidy with respect to the manufacture, production, or exportation of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States, and

(2) the Commission determines that—

(A) an · industry in the United States—

(i) is materially injured, or

(ii) is threatened with material injury, or

(B) the establishment of an industry in the United States is materially retarded,

by reason of imports of that merchandise or by reason of sales (or the likelihood of sales) of that merchandise for importation,

then there shall be imposed upon such merchandise a countervailing duty, in addition to any other duty imposed, equal to the amount of the net subsidy. For purposes of this subsection and section 1675d(b)(1) of this title, a reference to the sale of merchandise includes the entering into of any leasing arrangement regard-

J. National Preinvestment Fund for Studies and Projects (FONEP);
K. Fondo Nacional de Fomento Industrial (FOMIN);
L. Preferential State Investment Incentives;

M. Government Financed Technology Development;
N. Preferential Vessel, Freight, Terminal, and Insurance Benefits;
O. Accelerated Depreciation.

ing the merchandise that is equivalent to the sale of the merchandise.

19 U.S.C. § 1671(a). While the term "bounty or grant" as used in § 1303 has not been statutorily defined, Congress ascribed the following meaning to the term "Subsidy" in § 1671:

(5) **Subsidy.**—The term "subsidy" has the same meaning as the term "bounty or grant" as that term is used in section 1303 of this title, and includes, but is not limited to, the following:

(A) Any export subsidy described in Annex A to the Agreement (relating to illustrative list of export subsidies).

(B) The following domestic subsidies, if provided or required by government action to a specific enterprise or industry, or group of enterprises or industries, whether publicly or privately owned, and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise:

(i) The provision of capital, loans, or loan guarantees on terms inconsistent with commercial considerations.

(ii) The provision of goods or services at preferential rates.

(iii) The grant of funds or forgiveness of debt to cover operating losses sustained by a specific industry.

(iv) The assumption of any costs or expenses of manufacture, production, or distribution.

19 U.S.C. § 1677(5).

To the extent this Court's jurisdiction is not challenged, review of the administrative determinations challenged here is provided by 19 U.S.C. § 1516a(a)(2). Accordingly, the applicable standard of review is whether the ITA's determination is unsupported by substantial evidence on the record or is otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B).

## DISCUSSION

### I. FICORCA

In its petition, plaintiff alleged that Vitro, S.A., the holding company for the two float glass producers, Vitro Flotado and Vidrio Plano, was seeking to reschedule foreign debt through FICORCA. Plaintiff requested the ITA investigate the attempts of the Vitro Group, which includes Vitro, S.A., Vitro Flotado, and Vidrio Plano to reschedule debt through FICORCA.

The questionnaire sent to the Mexican government by the ITA as part of its investigation specified that responses should be for all firms exporting float glass to the United States and should include any benefits enumerated that flow through a group. One of the benefits enumerated was FICORCA.

The response to the questionnaire indicated that neither Vitro nor Vidrio had participated in FICORCA. The ITA therefore made a preliminary determination FICORCA had not been used. 48 Fed.Reg. 56095, 56096 (Dec. 19, 1983).

Thereafter, as previously mentioned, the ITA entered into a suspension agreement, and plaintiff requested a continuation of the investigation. In the final determination, the ITA stated:

FICORCA is a trust fund set up by the Mexican government and the Bank of Mexico operating through the country's credit institutions. All Mexican firms with registered debt in foreign currency and payable abroad to Mexican credit institutions or to foreign financial entities or suppliers may purchase, at a controlled rate, the amount in dollars necessary to pay principal on the loan. All loans which are covered by the program must be long-term or be restructured on a long-term basis. The program was terminated December 20, 1982. Companies had until October 25, 1983, to register for the program. We verified that the float glass companies did not have any rescheduling of debt during our period of investigation. The float glass companies have not used the program. We also have verified documentation that the program is available to all Mexican firms with foreign indebtness; it is not targeted to a specific industry or enterprise, group of industries or enterprises, or to companies located in specific regions. FICORCA is also not tied in any way to

exports. Therefore, we have determined this program is not countervailable.

49 Fed.Reg. 23097, 23099 (June 4, 1984).

Before analyzing the FICORCA program, the Court must first digress to a discussion of the connection between § 1303 and § 1677(5). Plaintiff contends general availability is an inappropriate test in a § 1303 investigation. According to the plaintiff, the introductory clause of § 1677(5) makes clear that the interpretation of "bounty or grant" under § 1303 controls the meaning of "subsidy" in § 1677(5). At best, only the procedures set forth at Subtitle IV (i.e., § 1677(5)) as implemented by regulations, control the application of § 1303. Because there is no regulation under § 1677(5) and "subsidy" has not been defined in 19 C.F.R. § 355.7, there is no justification for a narrow interpretation of § 1303.

■ By contrast, the defendant as well as the defendant-intervenors, contend Congress intended the words "bounty or grant" and "subsidy" should have the same meaning and be measured by the same standards. Accordingly, and pursuant to § 1677(5), the defendant and defendant-intervenors maintain that domestic subsidies must be provided to a "specific enterprise or industry, or group of enterprises or industries" to be countervailable. This limitation is therefore integral to the definition of bounty or grant. This Court agrees.

Just as this Court held in *Cabot Corp. v. United States*, 9 CIT ——, 620 F.Supp. 722 (1985), *appeal dismissed*, 788 F.2d 1539 (Fed.Cir.1986), § 1303 supplies the substantive law of this case. In interpreting § 1303, the Court may refer to § 1677(5). *See Bethlehem Steel Corp. v. United States*, 7 CIT 339, 590 F.Supp. 1237 (1984); *Carlisle Tire & Rubber Co. v. United States*, 5 CIT 229, 235, 564 F.Supp. 834, 839 (1983).

■ Section 1677(5) provides that the term subsidy has the same meaning as bounty or grant. The legislative history also makes clear that § 1677(5) was intended "to clarify that the term has the meaning which administrative practice and the courts have ascribed to the term bounty or grant under § 303 of the Tariff Act of 1930, unless that practice or interpretation is inconsistent with the bill." S.Rep. No. 249, 96th Cong., 1st Sess. 84–85 (1979), U.S.Code Cong. & Admin.News 1979, pp. 381, 470–471. Congress thus intended there be complete harmony between the two provisions. *Bethlehem Steel*, 7 CIT at 341. It is also irrelevant which statute controls as "the law defining the term bounty or grant informs the interpretation of the term subsidy." *Cabot*, 9 CIT at ——, 620 F.Supp. at 730.

Plaintiff contends the terms "bounty and grant" reach all bounties and grants however paid or bestowed. In other words, if the effect of the program is to reduce the cost of producing or exporting, the advantage must be countervailed irrespective of whether or not other companies receive similar benefits.

Plaintiff maintains that the general availability test is contrary to the legislative history and purpose of the countervailing duty law. According to the plaintiff, the law is intended to protect domestic industries from all trade that receives bounties or grants. Congress further intended the law be vigorously enforced to reduce and eliminate the effects of benefits bestowed on trade.

Plaintiff further contends the general availability test has not entered the law through legislative recognition of a long-standing administrative interpretation since the interpretation fails to meet the "long-standing" requirement. Finally, plaintiff alludes to the absurdity of the results that would follow from application of the ITA's general availability test.

The defendant and the defendant-intervenors essentially rely upon the literal language of § 1677(5) in support of the ITA's application of the general availability rule. In interpreting § 1677(5), the ITA views the word "specific" as necessarily modifying enterprise or industry, or group of enterprises or industries. *See Final Affirmative Countervailing Duty Determinations; Certain Steel Products From Belgium,* 47 Fed.Reg. 39304, 39328 (Sept. 7,

1982). If it was not the intent of Congress to limit domestic subsidies as such, this language, in the defendant's view, would be superfluous.

Both the defendant and the intervenors contend Congress knew and approved of the ITA's interpretation when it failed to amend § 1677(5) in the Trade and Tariff Act of 1984, in other words, by deleting the specificity language. Furthermore, the ITA has never countervailed a generally available benefit under § 1303. In adopting the specificity language, Congress explicitly endorsed the ITA's interpretation of § 1303.

The defendant and the intervenors contend plaintiff's reliance upon earlier cases is misplaced. These cases dealt with either export subsidies or subsidies provided to a particular region both of which are countervailable irrespective of their general availability. They urge this Court adopt the approach taken in *Carlisle* and reject the "dictum" of *Bethlehem Steel.*[4]

In *Cabot*, this Court ruled upon some of the same issues raised in this action. The *Cabot* Court specifically held:

> The definition of "bounty or grant" under § 1303 as intended by Congress remains as it is embodied in the case law and later affirmed by Congress in § 1677(5). This definition requires focusing only on whether a benefit or "competitive advantage" has been actually conferred on a "specific enterprise or industry, or group of enterprises or industries."

*Cabot Corp. v. United States*, 9 CIT at ——, 620 F.Supp. at 732. *Cabot* distinguished between non-countervailable generalized benefits and those benefits conferred upon specific enterprises or industries or groups of enterprises or industries. *See* 9 CIT at ——, 620 F.Supp. at 731.

In *Cabot*, this Court further noted the absurdity of a rule that requires imposition of countervailing duties where producers or importers have received such generalized public benefits, i.e., (infrastructure, education, national defense) as almost every imported good entering the stream of commerce would be subject to countervailing duties. 9 CIT at ——, 620 F.Supp. at 731-2 (citing *Carlisle*, 5 CIT at 233, 564 F.Supp. at 838). On the other hand, the *Cabot* Court noted the absurdity of a rule that transforms an obvious bounty into a non-countervailable benefit by making the program "generally available." *Cabot*, 9 CIT at ——, 620 F.Supp. at 732 (citing *Bethlehem*, 7 CIT at 350, 590 F.Supp. at 1242).

*Cabot* held, moreover, that "the appropriate standard focuses on the *de facto* case by case effect of benefits provided to recipients rather than on the nominal availability of benefits." 9 CIT at ——, 620 F.Supp. at 732. *Cabot* directed the ITA to determine, in each case, whether a benefit or competitive advantage had actually been conferred upon a "specific enterprise or industry, or group of enterprises or industries." Although general availability may be a manifestation that a program has not conferred a benefit upon a specific recipient, general availability is not the statutory test. It is merely one of several relevant factors to be considered in determining whether or not a benefit or competitive advantage has been conferred upon a "specific enterprise or industry, or group of enterprises or industries." *See* § 1677(5).

*Cabot* held that the provision of carbon black feedstock and natural gas at controlled prices, although nominally available, appeared in actual implementation, to supply a benefit to a specific enterprise or industry, or group thereof. Although the instant case concerns FICORCA as well as natural gas, the *Cabot* analysis is similarly applicable.[5]

---

**4.** The *Carlisle* Court held that two accelerated depreciation programs under Korean corporation tax law were not countervailable since the benefits were generally available to the entire Korean business community. Similarly, the *Bethlehem* Court considered a South African program which provided a 200% tax deduction for expenses to companies whose employee training programs were certified by the government. The *Bethlehem* Court held the program was a tax law which was not selective and was not, therefore, a countervailable subsidy.

**5.** At least with regard to the carbon black industry, the decision in *Cabot* was influenced by the actual number of users of carbon black feed-

The Court will now consider whether or not the ITA properly applied the statutory test in determining if the benefits of FICORCA should be countervailed. As stated previously, the ITA verified FICORCA was available to all Mexican firms with registered debt in foreign currency payable abroad. According to the verification report, the loans had to be long-term or restructured on a long-term basis. Although the program was terminated December 20, 1982, the companies had until October 25, 1983 to register for the program.

■ Plaintiff contends that since FICORCA was available *only* to Mexican firms having long-term debt in foreign currency payable abroad, FICORCA benefits were specific to a particular industry. In response, the defendant-intervenors refer this Court to the *Carlisle* decision in which Judge Maletz dismissed the plaintiff's contention that a tax benefit was countervailable since not every company met the eligibility criteria. *Carlisle*, 5 CIT at 231, n. 3, 564 F.Supp. at 836, n. 3. This Court agrees with the defendant-intervenors and holds that the mere fact that a program contains certain eligibility requirements for participation does not transform the program into one which has provided a countervailable benefit. The test necessarily involves subjective case by case decisions to determine whether there is a discrete class of beneficiaries. There may, of course, be situations in which narrowly-drawn eligibility requirements *de facto* render the benefit one which is provided to a specific enterprise or industry or group of enterprises or industries. This Court finds, however, after an examination of the record, FICORCA requirements do not *de facto* render the benefit one which is provided to such a discrete class of beneficiaries.

Plaintiff contends further the ITA failed to investigate or verify, either as a part of the original countervailing duty determination or as a part of the process followed in entering the suspension agreement, wheth-

er or not Vitro, S.A. renegotiated any loans through FICORCA for the benefit of its subsidiaries. According to the plaintiff, although Vitro, S.A. only provides support services for its subsidiaries, any benefit received by it through FICORCA would flow to the subsidiaries without necessarily appearing on the accounts of the subsidiaries. Furthermore, plaintiff contends, although the questionnaire of the Mexican government indicated that neither Vitro Flotado nor Vidrio Plano participated in FICORCA, the ITA should have investigated to what extent Vitro, S.A. participated in the program.

The verification report indicates the companies did not reschedule debt for their own accounts during the period of investigation. Company officials further indicated that if Vitro, S.A. renegotiated loans for the benefit of its subsidiaries, this fact would be evident from the accounts of the subsidiaries. The ITA randomly sampled the accounts of the subsidiaries and found no evidence that the subsidiaries received benefits under FICORCA. The ITA also determined a separate investigation of Vitro, S.A. was unwarranted since Vitro, S.A. was not a manufacturer, exporter, or producer. The ITA indicated that pursuant to the suspension agreement, Vitro Flotado and Vidrio Plano, the subsidiary companies, would be required to promptly inform the ITA of any new or equivalent benefits for float glass.

■ Although it appears the verification conducted by the ITA was reasonable and not arbitrary, it is not necessary to determine if the ITA's verification was adequate. The ITA reasonably determined pursuant to its statutory mandate that FICORCA benefits are not countervailable since they do not provide a benefit to a specific enterprise or industry, or group of enterprises or industries. Thus, if Vitro, S.A. had received FICORCA benefits, these benefits would still not be countervailable

---

stock or catcracker bottoms. The record established that no enterprise or industry in Mexico other than the carbon black industry had the technology and ability to make commercial use of the product. Thus, although the favorable

price for carbon black feedstock was nominally available to *all* Mexican enterprises and industries, it appeared that the program actually conferred a benefit upon a specific enterprise or industry, or group of enterprises or industries.

even if the benefits devolved upon the subsidiaries.

## II. FOMENTO COMERCIO EXTERIOR (FCE)

The Court will now examine the ITA's determination not to include FCE as a party to the suspension agreement and not to conduct a separate investigation of FCE. In its petition, plaintiff contended FCE, an exporter and an apparent sister company of the float glass producers, Vitro Flotado and Vidrio Plano, had received extra-CEDIs. Because FCE was responsible for many of the export related activities of Vitro, S.A., plaintiff argued that the two float glass producers received indirect bounties or grants as a result of the extra-CEDIs bestowed upon FCE.

After consideration of the responses to the questionnaires sent by the ITA, the ITA made a preliminary determination that the float glass producers had not utilized the extra-CEDI program. The ITA verification team visited the CEDI offices of the Mexican government and determined extra-CEDIs were not received by any Mexican companies. The verification report also discusses the role of FCE. The report indicates FCE provides special marketing services and operates similarly to an export or trading company of the United States.[6]

After the verification, but immediately prior to the conclusion of the suspension agreement, plaintiff alleged that extra-CEDIs had been paid out under the guise of CEPROFIs. Plaintiff requested, but the ITA refused to reverify this allegation in Mexico. Plaintiff further requested the ITA include FCE as a party to the suspension agreement.

Upon the conclusion of the suspension agreement, plaintiff requested, pursuant to § 1671c(g), that the ITA continue its investigation. Plaintiff alleged FCE had received CEDIs and CEPROFIs and provided a computer printout from the Mexican government to that effect. The ITA decided not to reverify this allegation, in part since by the terms of the suspension agree-

ment, the companies renounced any benefits flowing, albeit indirectly, through FCE. *See* 49 Fed.Reg. 23097, 23101.

Plaintiff contends the ITA improperly refused to include FCE as a party to the suspension agreement. Furthermore, plaintiff contends, the ITA throughout the course of the proceeding, performed an inadequate investigation by failing to thoroughly examine all allegations of the petitioner.

█ The defendant maintains that the ITA investigated and verified all allegations that were timely raised. Although the petition alleged FCE received extra-CEDIs, no evidence in support of this allegation was supplied. In verifying, the ITA found no evidence that the extra-CEDI program even existed. The ITA examined the accounts of the float glass producers and found no evidence of extra-CEDIs. Because FCE only provides services, and the ITA does not countervail subsidized services that cannot be tied to the manufacture, production, or exportation of a product, the defendant contends, a separate investigation of FCE was unnecessary. Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment Upon the Agency Record at 58. Furthermore, because a suspension agreement was concluded, and this agreement complied with the statute, according to the defendant, the ITA properly decided not to reverify allegations in Mexico after the agreement was made. A separate investigation of FCE would have impermissibly expanded the scope and duration of the investigation and violated congressional desire that suspension agreements lead to rapid resolution of the issues.

█ The defendant-intervenors contend that this Court should not consider allegations that FCE received CEDIs and CEPROFIs because the evidence pertaining to this allegation was not before the ITA when the suspension agreement was concluded and is therefore not part of the administrative *record* before this Court. By contrast, plaintiff contends the record

---

**6.** The verification report indicates that FCE is owned by a number of Mexican industries including Vitro and Vidrio each of which own one percent.

consists of all information obtained during the course of the proceeding which began when the petition was submitted and ended when the final determination was published. This Court agrees with the defendant-intervenors, since the information relied upon by the ITA was all that was available when the suspension agreement was made.

■ Plaintiff further suggests that the ITA should have conducted a separate investigation of FCE during the verification. Without considering the various assumptions of Commerce such as the seller of an input attempts to maximize its total returns, there is ample evidence in the record to justify the ITA's action at this stage in not conducting a separate investigation and verification of FCE. Beyond the allegation of plaintiff, the verification report shows there was no evidence the extra-CEDI program even existed. In fact, it was after verification that plaintiff alleged extra-CEDIs had been conferred under the guise of CEPROFIs. Thus, at this earlier time, it was reasonable for the ITA to have refused to conduct a separate investigation of FCE.

The next question presented for decision is whether or not the ITA's failure to include FCE as a party to the suspension agreement rendered its conclusion contrary to law. Essential to the analysis is the language of the provision governing the suspension of an investigation:

(b) **Agreements to eliminate or offset completely a subsidy or to cease exports of subsidized merchandise.**—The administering authority may suspend an investigation if the government of the country in which the subsidy practice is alleged to occur agrees, or exporters who account for substantially all of the imports of the merchandise which is the subject of the investigation agree—

(1) to eliminate the subsidy completely or to offset completely the amount of the net subsidy, with respect to that merchandise exported directly or indirectly to the United States, within 6 months after the date on which the investigation is suspended, or

. . . .

(d) **Additional rules and conditions.**—

(1) **Public interest; monitoring.**—The administering authority shall not accept an agreement under subsection (b) or (c) of this section unless—

(A) it is satisfied that suspension of the investigation is in the public interest, and

(B) effective monitoring of the agreement by the United States is practicable.

. . . .

(e) **Suspension of investigation procedure.**—Before an investigation may be suspended under subsection (b) or (c) of this section the administering authority shall—

(1) notify the petitioner of, and consult with the petitioner concerning, its intention to suspend the investigation, and notify other parties to the investigation and the Commission not less than 30 days before the date on which it suspends the investigation,

(2) provide a copy of the proposed agreement to the petitioner at the time of the notification, together with an explanation of how the agreement will be carried out and enforced (including any action required of foreign governments), and of how the agreement will meet the requirements of subsections (b) and (d) or (c) and (d) of this section, and

(3) permit all parties to the investigation to submit comments and information for the record before the date on which notice of suspension of the investigation is published under subsection (f)(1)(A) of this section.

. . . .

(g) **Investigation to be continued upon request.**—If the administering authority, within 20 days after the date of publication of the notice of suspension of an investigation, receives a request for the continuation of the investigation from—

(1) the government of the country in which the subsidy practice is alleged to occur, or

(2) an interested party described in subparagraph (C), (D), (E), and (F) of section 1677(9) of this title which is a party to the investigation, then the administering authority and the Commission shall continue the investigation.

19 U.S.C. § 1671c. The procedures governing suspension are therefore carefully tailored to effectuate the remedial purposes of the countervailing duty law. The pertinent sections of the Senate Report confirm this sentiment:

> The suspension provision is intended to permit rapid and pragmatic resolutions of countervailing duty cases. However, suspension is an unusual action which should not become the normal means of disposing of cases. The committee intends that investigations be suspended only when that action serves the interests of the public and the domestic industry affected. For this reason, the authority to suspend investigations is narrowly circumscribed. In particular, agreements which provide for any action less than elimination of the subsidy, complete offset of the net subsidy amount, or cessation of exports can be accepted only in extraordinary circumstances. That is to say, very rarely. Furthermore, the requirement that the petitioners be consulted will not be met by pro forma communications. Complete disclosure and discussion is required.

S.Rep. No. 96–249, 96th Cong., 1st Sess. 54 (1979), U.S.Code Cong. & Admin.News 1979, p. 440. The House Report echoes the views of the Senate:

> The Committee recognizes the importance of this provision to both importers and domestic industry as a means of achieving the remedial purposes of the law in as short a time as possible and with a minimum expenditure of resources by all parties involved. However, the Committee is equally concerned that the authority to suspend investigations be exercised within the carefully circumscribed limits set forth in the bill.

H.R.Rep. No. 96–317, 96th Cong., 1st Sess. 53–4 (1979).

In the agreement suspending the countervailing duty investigation, the companies, Vitro and Vidrio, agreed to the following:

> 3. The companies will not apply for or receive, *directly or indirectly*, any benefits that the Department has determined to be countervailable from the Certificates of Fiscal Promotion (CEPROFI) program with respect to the subject product on or after the effective date of this agreement. Any countervailable CEPROFIs which have been applied for but not yet received or received but not entirely used shall not be accepted or used and shall be returned to the Government of Mexico unused within 30 days of the date of this agreement.
>
> 4. Effective August 25, 1982, the Certificado de Devolucion de Impuesto (CEDI) program discontinued the eligibility of all products, including unprocessed float glass, from Mexico for CEDI tax rebates. The companies will not apply for or receive *directly or indirectly* any countervailable benefits under this program, with respect to shipments of the subject merchandise exported and entered, or withdrawn from warehouse, for consumption in the United States on or after the effective date of this agreement, if eligibility for CEDI is reinstated. Any outstanding CEDIs shall not be used and shall be returned to the Government of Mexico unused within 30 days of the date of this agreement.
>
> . . . .
>
> 7. The companies agree that they will not apply for nor receive *directly or indirectly* any new or equivalent benefits for the subject merchandise as a substitute for any benefit renounced by the agreement.
>
> . . . .
>
> **C. Monitoring of the Agreement**
>
> 1. The companies agree to supply to the Department any information and documentation which the Department deems necessary to demonstrate that they are in full compliance with the agreement. The companies agree to permit such data collection and verification as the Depart-

ment deems necessary in order to monitor this agreement.

49 Fed.Reg. at 7267–8 (emphasis added).

Congress does not appear to have provided a definition for the term "exporter" as used in the provision for the suspension of investigations. There is no indication of the intended scope of the term beyond a general admonition that the suspension agreement be carefully tailored to provide for the elimination of countervailable benefits. Underlining the significance of this warning is the requirement for practicable and effective monitoring of the suspension agreement.

██ It appears from an analysis of these materials and the facts of this case that the suspension agreement complies reasonably with the requirements for suspending an investigation. The agreement was made with the only two known exporters of float glass, Vitro and Vidrio.[7] Furthermore, the agreement prevents the companies from applying or receiving, directly or *indirectly*, countervailable benefits from CEPROFI and CEDI as well as any new or equivalent benefits for the subject merchandise as a substitute for any benefit renounced by the agreement.

Furthermore, although the suspension agreement contains no explicit provision for monitoring the receipt of benefits by FCE, the agreement provides that the *companies* will supply the ITA with all information needed to document and verify compliance with the agreement. 49 Fed.Reg. at 7268. Since the breadth of the suspension agreement is extensive, and the provisions for agency monitoring appear sufficient, the Court holds it was not necessary to include FCE as a party to the suspension agreement.

Finally, and in sum, the ITA did not violate its statutory duty to conduct an adequate investigation under 19 U.S.C. § 1671a(b) and 1671c(g) as enunciated by this Court in *Republic Steel Corp. v. Unit-*

*ed States,* 4 CIT 33, 544 F.Supp. 901 (1982). Although the *Republic Steel* Court held that the petition, if sufficient, frames the proceedings, the issue in that case was whether the ITA had discretion to treat the European Community (EC) as a distinct and separate country when the petitioner had alleged the EC was subsidizing imported steel products. In the present case, by contrast, plaintiff requested in its petition that the ITA investigate the activities of FCE to determine the sources and uses of its funds and to determine if the float glass producers received CEDIs and extra-CEDIs indirectly through FCE. Although a separate investigation of FCE was not conducted as such, the ITA reasonably determined during verification that extra-CEDIs did not exist. In light of this finding, it was reasonable for the ITA to have determined not to investigate FCE on a separate basis.

## III. NATURAL GAS

The defendant-intervenors contend this Court lacks jurisdiction over plaintiff's challenge of the ITA's decision to terminate and rescind its initiation of investigation of natural gas pricing. According to the defendant-intervenors, this decision constituted a final negative determination by the ITA not to initiate an investigation under 19 U.S.C. § 1671a(c) which is reviewable in accordance with 19 U.S.C. § 1516a(a)(1)(A). This section provides for a review of a determination not to initiate an investigation within 30 days from the date of publication of the determination. Since the first action was commenced more than 30 days from the date of determination, according to the defendant-intervenors, plaintiff's challenge is untimely, and the Court lacks jurisdiction. By contrast, plaintiff contends this Court's decision in *Can-Am Corp. v. United States,* 9 CIT ——, 613 F.Supp. 1246 (1985), squarely addresses this issue and provides a clear basis for jurisdiction over plaintiff's challenge in this case.

---

**7.** Plaintiff suggests FCE is also an exporter of float glass since the verification report indicates FCE sells many products other than glass. Since this is the only reference brought to the Court's attention by plaintiff, and since other portions of the record demonstrate FCE is not an exporter of glass, the Court holds the ITA reasonably determined FCE was not an exporter.

In *Can-Am*, plaintiffs, domestic lime producers and unions representing lime industry workers filed a petition with the ITA alleging Mexico gives manufacturers, producers, and exporters of lime "bounties or grants" under 19 U.S.C. § 1303. In the notice of initiation of an investigation, the ITA stated on the basis of an earlier determination it would not investigate an allegation that the sale of fuel oil to the Mexican lime producers for less than world market prices conferred a bounty or grant. Within 30 days from the publication of a final affirmative determination, plaintiff commenced an action challenging the ITA's decision not to investigate the fuel oil issue.

By a motion for dismissal, the defendant-intervenor in *Can-Am* contended the action was untimely since the decision was a determination not to initiate an investigation which should have been filed 30 days from the date of publication.

The *Can-Am* Court rejected the intervenor's position that § 1516a(a)(1)(A) controlled the outcome since the ITA had indeed initiated an investigation. The Court held that appeal was appropriate under § 1516a(a)(2) within 30 days from the date of publication of a final duty order since the decision not to investigate the fuel oil issue was a negative aspect of a final affirmative determination. In support of its holding, the *Can-Am* Court reviewed pertinent sections of the legislative history of the Trade and Tariff Act of 1984 which allows immediate review of an aspect of a determination which excludes a product or country but eliminates review of other negative aspects until publication of a final countervailing duty order.

▪ *Can-Am* is instructive in defining the parameters of this Court's jurisdiction under § 1516a(a)(1)(A). It appears in the instant case that the ITA terminated and rescinded its initiation of investigation as one aspect of its preliminary determination. Since this determination under *Can-Am* would not be immediately appealable, review is not appropriate under this provision. As the ITA terminated and rescinded its initiation of investigation, it is manifestly clear that the ITA did not fail to initiate an investigation.

▪ Review is appropriate in accordance with § 1516a(2)(A) within 30 days after a final negative determination or a final countervailing duty order. Since plaintiff commenced this action within 30 days of publication of notice of the suspension of investigation, this action was timely filed.

The argument that this Court's decision in *Republic Steel Corp. v. United States*, 4 CIT 17 (1982), applies is equally unpersuasive. As the *Can-Am* Court found, and with which this Court concurs, *Republic Steel* relied upon the former section 1516a(a)(1)(B) which permitted interlocutory appeals. In repealing this provision, Congress evinced an intent to eliminate piecemeal litigation, a result that would occur if the defendant-intervenors' position were adopted.

The last issue addressed by this Court concerns the ITA's determination that the float glass companies paid the published price of natural gas which was available to all industries and therefore received no countervailable benefit.

In its petition, plaintiff contended that natural gas was sold in Mexico at prices far below world market prices. According to the plaintiff, this price differential conferred an enormous cost advantage upon the producers of float glass in Mexico. Plaintiff also alleged the float glass industry paid a lower price for natural gas than was paid by other industries.

In the preliminary affirmative determination, the ITA terminated and rescinded its investigation of alleged preferential pricing of natural gas. The ITA stated that it had determined in prior investigations that the program was not countervailable, and no information which would cause it to review this determination was received. *See* 48 Fed.Reg. at 56095. It stated that "the existence of a price differential between export and domestic sales of natural gas, or between domestic and 'world market' prices, does not, in and of itself, confer a bounty or grant." *Id.* The ITA stated further it would seek additional information on whether the float glass industry

272

paid lower prices for natural gas than was paid by other industries.

In the final determination, the ITA determined that preferential prices on natural gas were not given to the float glass industry. The ITA verified that the float glass companies paid the published price for natural gas that was available to all industries and therefore received no countervailable benefit. The ITA also verified that the program which provided energy to special industries at preferential prices had been discontinued.

Plaintiff contends the decision to make natural gas available to Mexican producers of float glass at prices below world market levels bestows a countervailable bounty or grant. The advantage confers a benefit upon Mexican producers and exporters vis-a-vis producers and exporters in other countries. It is therefore a "special" and countervailable benefit.

The defendant relies upon the ITA's finding that all industrial users in Mexico could obtain natural gas at the same price and therefore because of the general availability of natural gas, no countervailable bounty or grant was bestowed. Furthermore, even if these rates were not generally available, the rates would not be countervailable since they are not "preferential" within the meaning of § 1677(5)(B)(ii).

In accordance with this Court's holding above regarding the FICORCA program, the appropriate standard or test requires the agency to conduct a *de facto* case by case analysis to determine whether or not a program provides a "subsidy" or a "bounty or grant" to a "specific enterprise or indus-

try, or group of enterprises or industries." 19 U.S.C. §§ 1303, 1677(5).

Since the ITA determined Vitro Flotado and Vidrio Plano paid the published price for natural gas which was available to all industries, it appears the ITA's determination was in substantial accordance with the statutory standard. This test directs the ITA to determine, in each case, whether or not a benefit has been bestowed upon a specific enterprise or industry, or group of enterprises or industries. Furthermore, it is well established that the mere existence of a price differential between exported and domestic prices, does not in and of itself confer a bounty or grant under § 1303. *See, e.g., United States v. Zenith Radio Corp.*, 64 CCPA 130, 138, C.A.D. 1195, 562 F.2d 1209, 1216 (Fed.Cir.1977), *aff'd*, 432 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978) ("Congress has not statutorily required that every governmental action distinguishing between products consumed at home and those exported shall be deemed the bestowing of a bounty or grant.")

For the reasons stated herein, the Court holds the ITA's determination is supported by substantial evidence on the record and is otherwise in accordance with law. The plaintiff's motion for judgment upon the agency record is accordingly denied.