**CAN–AM CORP., et al., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

**and**

**Industrias Quimicas De Yucatan, S.A., Defendant-Intervenor.**

**Court No. 84–10–01411.**

United States Court of International Trade.

June 4, 1987.

**1446**

Squire, Sanders & Dempsey, Ritchie T. Thomas and William D. Kramer, Washington, D.C., for plaintiffs.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Platte B. Moring, III, Washington, D.C., for defendant.

Brownstein, Zeidman and Schomer, Irwin P. Altschuler and David R. Amerine, Washington, D.C., for defendant-intervenor.

## MEMORANDUM OPINION AND ORDER

DiCARLO, Judge:

Plaintiffs, three southwestern United States lime producers (Can-Am Corp., Paul Lime Division; Chemical Lime, Inc.; Genstar Lime Co.) and two unions (United Cement, Lime, Gypsum and Allied Workers Division of the International Brotherhood of Boilermakers, AFL–CIO/CLC; United Steelworkers of America, AFL–CIO/CLC), challenge a final affirmative countervailing duty determination and order by the United States Department of Commerce, International Trade Administration (Commerce) re-

specting lime from Mexico. Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Lime From Mexico, 49 Fed.Reg. 35,672 (1984). The Court denied a motion by defendant-intervenor to sever and dismiss part of plaintiffs' action. See Can-Am Corp. v. United States, 9 CIT ——, 613 F.Supp. 1246 (1985).

Plaintiffs now move pursuant to Rule 56.1 of the rules of this Court for judgment upon the agency record. The Court has jurisdiction pursuant to 19 U.S.C. § 1516a(-a)(2)(A)(i)(II) (1982 & Supp. III 1985). The action is dismissed.

### I. Background

Plaintiffs filed a petition with Commerce alleging that the government of Mexico bestows bounties or grants within the meaning of section 303 of the Tariff Act of 1930 (the Act), as amended, 19 U.S.C. § 1303 (1982), upon the manufacture and export of lime produced in Mexico. Alleged in the petition, among others, were claims that the Mexican government engages in a "first-level" fuel pricing practice whereby it sells heavy and light fuel oil through its wholly-owned petroleum monopoly Petroleos Mexicanos (PEMEX) to Mexican industries at prices far below the world market prices paid by United States industries and that this practice is countervailable because it allows the highly energy intensive lime industry to obtain cheaper fuel which in turn allows the lime produced to be sold at reduced prices upon export to the United States; that Mexican lime producers also received a 30% reduction from the already underpriced fuel and this "second-level" discount on fuel oil prices and certain special purchase arrangements from PEMEX are countervailable; and that Certificates of Fiscal Promotion (CEPROFI certificates) given as credits against federal taxes to Mexican companies for locating in specific regions, investing in small and medium sized firms, generating jobs, acquiring new plants and equipment, and purchasing Mexican capital goods are countervailable.

After reviewing these and other claims made in the petition, Commerce initiated a countervailing duty investigation with re-

spect to lime from Mexico. *Lime from Mexico; Initiation of Countervailing Duty Investigation,* 49 Fed.Reg. 15,011 (1984). Commerce stated that it would not investigate plaintiffs' "first-level" fuel pricing claim:

> Petitioners allege that the difference between the price PEMEX sells fuel oil in the world market and the price it sells to industries within Mexico confers a bounty or grant to the lime industry. We have determined that the differences in these rates are not countervailable (see *Final Affirmative Countervailing Duty Determination: Portland Hydraulic Cement and Cement Clinker from Mexico* (48 FR 43063)).

49 Fed.Reg. at 15,012.

Commerce then issued its preliminary affirmative countervailing duty determination. *See Preliminary Affirmative Countervailing Duty Determination; Lime from Mexico,* 49 Fed.Reg. 25,656 (1984). Before verification and issuance of the final determination, plaintiffs requested Commerce not to limit its investigation of CEPROFI certificates received for the acquisition of plants or capital equipment to only those given during the designated investigation period but also to investigate those given in relation to the construction of Mexican lime plants prior to investigation.

In its final affirmative countervailing duty determination, Commerce again addressed plaintiffs' claim that PEMEX's sale of fuel oil to Mexican lime producers at below international market value confers a countervailable bounty or grant, reasoning: "As stated in the 'Notice of Initiation' of this case, we did not investigate this allegation because it had previously been found not to confer a bounty or grant, and petitioners did not allege new facts to justify a review of this finding." 49 Fed.Reg. at 35,677. Commerce also made a final determination that the Mexican lime industry did not receive a "second-level" price discount in the form of a 30% reduction in the price for fuel below the published prices available to other industries in Mexico. *Id.* Commerce found one company did receive a countervailable benefit by being allowed to delay payments on fuel it received from PEMEX. *Id.* at 35,675.

Commerce determined that CEPROFI certificates are countervailable as tax benefits and are to be allocated to the year of receipt. Commerce investigated and countervailed against such certificates received during the investigation period for the construction of plants and the purchase of capital equipment but refused to investigate or countervail those received before the investigation period. In response to plaintiffs' argument that plant and capital equipment CEPROFI certificates received in the years prior to the investigation period should be countervailed, Commerce stated: "CEPROFIs constitute a tax deduction to recipient companies. It is the Department's consistent practice to recognize tax benefits as one-time benefits pertaining to the year in which they were realized." *Id.* at 35,677.

Plaintiffs contend that Commerce erred in its determinations not to investigate or countervail against the "first-level" fuel pricing practice and the CEPROFI certificates given by the Mexican government for the acquisition of plants and capital equipment prior to the investigation period. The Court holds that Commerce did not err in these determinations.

### II. Opinion

Since the jurisdiction of the Court is provided by section 1516a(a)(2)(A)(i)(II), the standard of review is that set forth by Congress for actions brought under paragraph (2) of subsection (a) of 19 U.S.C. § 1516a. Under that standard, the Court shall hold unlawful any determination, finding, or conclusion found to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1982).

### A. "First-level" Fuel Pricing Practice

#### (1) Domestic bounty or grant

Relying upon *Cabot Corp. v. United States,* 9 CIT ——, 620 F.Supp. 722 (1985), *appeal dismissed,* 788 F.2d 1539 (Fed.Cir. 1986), plaintiffs claim that a domestic boun-

**1448**

ty or grant under section 1303 exists whenever the benefit of a government program is bestowed upon a specific class and such bestowal confers an additional benefit or competitive advantage upon the recipients. Plaintiffs argue that the "first-level" fuel pricing practice is a domestic bounty or grant because the fuel oil is provided at prices below world market value only to industrial purchasers who will use the fuel in Mexico and not to exporters of such fuel oil (a specific class). They say that the purchase of fuel oil at concessionary prices enables the Mexican producers, including lime producers, to sell their products in the United States at reduced prices (an additional benefit or competitive advantage to the recipients). Plaintiffs contend that Commerce improperly failed to investigate and to countervail against the "first-level" fuel pricing practice.

The Court finds that plaintiffs' interpretation of the test prescribed in *Cabot* for determining a domestic bounty or grant under section 1303 is in error. In *PPG Industries v. United States*, 11 CIT ——, 662 F.Supp. 258 (1987), Judge Carman who decided *Cabot* confronted a similar claim involving the provision of natural gas to the Mexican float glass industry. The plaintiffs in *PPG Industries* argued that the provision of natural gas at far below world market prices conferred a countervailable benefit because such price differential resulted in an enormous cost advantage to Mexican float glass producers and exporters vis-a-vis producers and exporters in other countries. *PPG Industries*, 11 CIT at ——, 662 F.Supp. at 258.

The *PPG Industries* Court first explained that section 1303 which employs the phrase "bounty or grant" provides the substantive law where, as in this case, the country involved in the investigation is not a "country under the Agreement" within the meaning of section 701(b) of the Act, as amended, 19 U.S.C. § 1671(b) (1982). The court concluded, however, that Commerce, as it did in this case, may rely upon the general countervailing duty provisions of section 701 of the Act, as amended, 19 U.S.C. § 1671, governing investigations of countries under the Agreement within the meaning of section 1671(b), which employs the term "subsidy" defined in section 771(5) of the Act, as amended, 19 U.S.C. § 1677(5) (1982) because the two provisions are legally interchangeable. *PPG Industries*, at —— – ——, 662 F.Supp. at 263–264.

The *PPG Industries* Court accepted Commerce's finding that "the existence of a price differential between export and domestic sales of natural gas, or between domestic and 'world market' prices does not, in and of itself, confer a bounty or grant," stating that "it is well established that the mere existence of a price differential between exported and domestic prices, does not in and of itself confer a bounty or grant under § 1303." *PPG Industries*, at —— – ——, 662 F.Supp. 271–272 (citing *United States v. Zenith Radio Corp.*, 64 CCPA 130, 138, C.A.D. 1195, 562 F.2d 1209, 1216 (Fed.Cir.1977), *aff'd*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978), for its proposition that "Congress has not statutorily required that every governmental action distinguishing between products consumed at home and those exported shall be deemed the bestowing of a bounty or grant"). The court stated that the appropriate standard or test requires Commerce to conduct a *de facto* case by case analysis to determine whether or not a program provides a "subsidy" or a "bounty or grant" to a "specific enterprise or industry, or group of enterprises or industries". The *PPG Industries* Court held that Commerce properly refused to countervail against the natural gas pricing program since the float glass companies under investigation paid the published price for natural gas and the gas was actually available to all Mexican industries at that price.

■ Commerce decided not to investigate the "first-level" fuel pricing practice as it relates to the Mexican lime industry based upon its earlier determination in the Mexican cement investigation that the price of heavy fuel oil to industrial users in Mexico did not confer a domestic bounty or grant because it did not benefit a "specific enterprise or industry, or group of enterprises or industries" within Mexico. 48

Fed.Reg. at 43,066. Commerce found that "all industrial users of heavy fuel oil can obtain this good at the same price." *Id.* The Court holds that Commerce applied a test consistent with that articulated in *PPG Industries,* and therefore this decision is in accordance with law.

■■■ Plaintiffs further argue that Commerce erred by not determining that all industrial users of fuel oil in Mexico constitute a specific group of enterprises or industries vis-a-vis a larger group which includes exporters in Mexico who are unable to purchase fuel oil at reduced prices for sale abroad. The test is whether the alleged benefit is bestowed upon a specific enterprise, industry or group of enterprises or industries within the country under investigation, and Commerce is granted discretion to determine whether a given group is a specific recipient of a benefit. In this case, the Court holds that Commerce acted within its discretion in determining that all industrial users of fuel oil were not a specific group of enterprises or industries within Mexico and therefore this determination is reasonable and according to law.

■ Also in the final determination, in response to plaintiffs' renewed request to have the Mexican fuel pricing practice countervailed, Commerce stated that this practice was not investigated since the petition did not contain new facts to justify a review of the earlier finding in the cement investigation. Plaintiffs' argument that the lime industry allegedly utilizes large amounts of fuel oil as compared with other industrial users in Mexico does not by itself demonstrate that the alleged benefits of the "first-level" fuel pricing practice were being provided specifically to the lime industry. *Cf. PPG Industries,* at ——, n. 5, 662 F.Supp. at 265, 266 n. 5 (noting that the decision in *Cabot* with respect to the carbon black industry was influenced by the fact that no other enterprise or industry had the technology or ability to make use of the carbon black feedstock or catcracker bottoms at issue). Since there was no new evidence that the lime industry might be a specific *de facto* recipient of either the heavy or light fuel oil programs, the Court finds that Commerce's decision not to reinvestigate is reasonable and in accordance with law.

Commerce's decision not to investigate or countervail against the "first-level" fuel pricing practice as a domestic bounty or grant under section 1303 is supported by substantial evidence and in accordance with law.

(2) Export bounty or grant

Plaintiffs next argue that the "first-level" fuel pricing practice of the Mexican government constitutes an export bounty or grant. In the earlier cement investigation relied upon by Commerce, it was reasoned that no export bounty or grant arises from this practice because the program does not confer a benefit contingent upon export performance or stimulate export sales over domestic sales. *See* 48 Fed.Reg. at 43,066.

According to plaintiffs, Commerce's requirements for determining export bounty or grants are too restrictive. They assert that export bounties or grants should be liberally defined, since section 771(5) of the Act, as amended, 19 U.S.C. § 1677(5)(A) (1982), covers "[a]ny export subsidy described in Annex A to the Agreement (relating to illustrative list of export subsidies)."

The illustrative list in Annex A of the Agreement on the Interpretation and Application of Articles VI, XVI, and XXIII of the General Agreement on Tariffs and Trade, GATT, Basic Instruments 56 (26th Supp.1980) ("Subsidies Code"), identifies as prohibited export subsidies, among others: "The provision by governments of direct subsidies to a firm or an industry contingent upon export performance"; "Currency retention schemes or any similar practices which involve a bonus on exports"; "Internal transport and freight charges on export shipment, provided or mandated by governments, on terms more favorable than for domestic shipment"; "The full or partial exemption, remission, or deferral specifically related to exports, of direct taxes or social welfare charges paid or payable by industrial or commercial enterprises";

"The allowance of special deductions directly related to exports or export performance, over and above those granted in respect to production for domestic consumption, in the calculation of the base on which direct taxes are charged."

As stated by our appellate court, "[a] reviewing court must accord substantial weight to an agency's interpretation of a statute it administers." *American Lamb Co. v. United States*, 4 Fed.Cir. ——, 785 F.2d 994, 1001 (1986) (citing *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450–51, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). Here Commerce asserts that in order to be an export bounty, grant or subsidy within the meaning of the countervailing duty statutes the benefit bestowed must be linked to the exportation of the goods. The Court finds this interpretation of section 1677(5)(A) "export" subsidies to be consistent with the types of subsidies described in Annex A to the Agreement. The Court also finds the requirements that the alleged benefit be contingent upon export performance or that it stimulate export sales over domestic sales to be consistent with the other forms of export subsidies in Annex A, and holds that such requirements are reasonable criteria for determining whether the benefit bestowed is sufficiently tied to the exportation of the goods.

Plaintiffs next argue that the "first-level" fuel pricing practice is expressly intended by the Mexican government to stimulate exports, citing to a portion of Mexico's National Industrial Development Plan (NIDP) which suggests that the price differential on energy sources is designed to be an incentive to exportation. Plaintiffs claim that the program also has the effect of stimulating export sales of lime to a far greater extent than domestic sales, reasoning that the costs advantage in manufacturing enjoyed as a result of the lower priced fuel aids export sales, but that domestic sales are unaffected because demand for lime in Mexico is generated by need rather than price.

In the cement investigation, Commerce did not find "any information that the pricing policy for industrial users is operated to stimulate export sales over domestic sales." 48 Fed.Reg. at 43,066. In this investigation, Commerce stated that "petitioners did not allege new facts to justify a review" of the earlier finding that the "first-level" fuel pricing practice was not a bounty or grant. 49 Fed.Reg. at 35,677.

It is not the function of the Court to weigh the evidence, but to review whether Commerce's determination is supported by substantial evidence. *See, e.g., Alhambra Foundry v. United States*, 9 CIT ——, 626 F.Supp. 402, 406–07 (1985) (citing *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966)). The Court holds the determination of Commerce that the "first-level" fuel pricing practice is not an export bounty or grant is supported by substantial evidence and according to law.

## B. CEPROFI Certificates

Commerce determined that CEPROFI certificates are one-time benefits to recipient companies in the form of a tax credit. In accordance with its prior practice concerning tax benefits, Commerce decided CEPROFI certificates should be allocated to the year in which they are realized. 49 Fed.Reg. at 35,677; *see Certain Refrigeration Compressors from the Republic of Singapore: Suspension of Countervailing Duty Investigation*, 48 Fed.Reg. 51,167, 51,168 (1983). Since it could not practically trace the actual use of the certificates to determine when realized, Commerce allocated the full amount of each certificate to the year in which it was received. 49 Fed.Reg. at 35,674; *see Pectin from Mexico; Final Affirmative Countervailing Duty Determination*, 48 Fed.Reg. 14,418, 14,421 (1983); *Portland Hydraulic Cement and Cement Clinker from Mexico; Final Results of Administrative Review of Countervailing Duty Order*, 50 Fed.Reg. 51,732, 51,737 (1985). By allocating the entire benefit to the year of receipt, Commerce only investigated and counter-

vailed against CEPROFI certificates received during the investigation period.

According to plaintiffs, CEPROFI certificates should be treated as capital asset subsidies and, like grants for capital investments, amortized over a reasonable period of time following the beginning of full scale operation and use of the plant or equipment. In that case, certificates received in prior years for building plants and purchasing capital equipment would be amortized and part of the benefit bestowed would be attributed to the investigation period. Plaintiffs contend Congress intended that all subsidies which provide an enterprise with capital equipment or a plant be amortized over a reasonable period of time. In support of this argument, plaintiffs cite to discussions of the provision created to define "net subsidy" in the Senate and House reports to the Trade Agreements Act of 1979.

In its report, the Senate Finance Committee stated:

The bill defines the term "net subsidy" to place clear limits on offsets from a gross subsidy. The gross subsidy is the value of the subsidy provided, or made available, and used. For example, if a firm is eligible for a tax credit as a result of locating a plant in an underdeveloped region of a country, the gross subsidy may be determined by the extent to which the credit is used against taxable income.

There is a special problem in determining the gross subsidy with respect to a product in the case of nonrecurring subsidy grants or loans, such as those which aid an enterprise in acquiring capital equipment or a plant. Reasonable methods of allocating the value of such subsidies over the production or exportation of the products benefiting from the subsidy must be used.

S.Rep. No. 249, 96th Cong., 1st Sess. 85, *reprinted in* 1979 U.S. Code Cong. & Ad. News 381, 471 (Senate Report).

The House Committee on Ways and Means stated:

There is, however, a special problem with regard to subsidies which provide an enterprise with capital equipment or a plant. In such cases, the net amount of the subsidy should be amortized over a reasonable period, following the beginning of full scale commercial operation of the equipment or plant, and assessed in relation to the products produced with such equipment or plant during such a period. Furthermore, in calculating the *ad valorem* effect of non-recurring subsidy grants or loans, reasonable methods of allocating the value of such subsidies over the production or exportation of products benefitting from them will be used. Such methods should include relating the benefit of the commercial advantage to the recipient, or relating the value of a subsidy for acquiring assets to their anticipated useful life, based on generally accepted accounting principles.

H.R.Rep. No. 317, 96th Cong. 1st Sess. 74–75 (1979) (House Report).

■ The Court first assesses whether Commerce was correct in its determination that CEPROFI certificates constitute tax credits to the recipient firms and are therefore tax benefits. Commerce found that "CEPROFIs are tax credits" and are "tax certificates of fixed value which may be used for a five-year period to pay federal taxes." 49 Fed.Reg. at 35,674. This finding is not disputed by plaintiffs, and the Court holds that Commerce's determination that CEPROFI certificates are tax credits is supported by substantial evidence.

■ The question remaining is whether it was contrary to law for Commerce not to amortize these tax credits over a reasonable period of time. Plaintiffs' position is that Congress intended to require Commerce to amortize tax credits of this type since they are received in relation to capital investments. The countervailing duty statutes are silent as to this issue, and plaintiffs' argument rests upon the discussion of "net subsidy" in the Senate and House reports to the Trade Act of 1979.

In the portion of the Senate report cited by plaintiffs, however, the Senate Finance Committee only recognized a "special problem" in the allocation of benefits from "nonrecurring subsidy grants or loans," de-

spite the immediate prior discussion regarding valuation of the benefits received from tax credits. Senate Report at 85, 1979 U.S.Code Cong. & Ad.News 471. This limited discussion by the committee does not evidence a clear intention of Congress to require Commerce to amortize the benefits of a tax credit received for making capital investments. Plaintiffs say they are not suggesting that capital investment CEPROFI certificates are grants and never argue these tax certificates are loans.

The House Ways and Means Committee similarly stated for nonrecurring subsidy grants or loans a reasonable means of allocating the benefit over production or exportation of the products "will be used," but makes a more general statement that the "special problem" under discussion involves "subsidies which provide an enterprise with capital equipment or a plant." House Report at 74–75. The House Committee does not state, however, that tax benefits may be considered subsidies that "provide" an enterprise with plants or capital equipment. It is unclear whether the Committee expected tax credits to be considered such subsidies, even if received for making capital investments, since a tax credit may only be used to offset taxes.

■ The Court holds that there is not a clear legislative requirement that Commerce amortize tax credits received for making capital investments. Although the Court may reject an agency's interpretation of the statute that agency administers if such interpretation contravenes clearly discernible legislative intent, its role when that intent is not contravened, as here, is to determine whether the agency's interpretation is "sufficiently reasonable." *American Lamb*, 785 F.2d at 1001 (citing *Federal Election Committee v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981); *Melamine Chemical, Inc. v. United States*, 732 F.2d 924, 928 (Fed.Cir.1984)). The interpretation of the agency "need not be the only reasonable construction or the one the court would adopt had the question initially arisen in a judicial proceeding." *American Lamb*, 785 F.2d at 1001 (citing

*Chevron, U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843 n. 11, 104 S.Ct. 2778, 2782 n. 11, 81 L.Ed.2d 694 (1984); *Consumer Products Division, SCM Corp. v. Silver Reed America, Inc.*, 753 F.2d 1033, 1039 (Fed.Cir.1985)). *See also Al Tech Specialty Steel Corp. v. United States*, 11 CIT ——, ——, ——, 661 F.Supp. 1206, 1208, 1213 (1987).

■ Commerce customarily treats tax benefits as one-time benefits allocated to the year in which they are realized. Finding CEPROFI certificates to be tax credits, Commerce followed this practice by allocating the benefit to the year of receipt. The Court holds that such treatment of these certificates even when received for making capital investments is sufficiently reasonable and is supported by substantial evidence.

## III. Conclusion

The determination by Commerce not to investigate or to countervail against the "first-level" fuel pricing practice of the Mexican government because it does not confer a countervailable bounty or grant is supported by substantial evidence and in accordance with law. The determination by Commerce to treat CEPROFI certificates received for making capital investments as tax benefits allocated to the year of receipt, even though it results in the failure to investigate or countervail against such certificates received prior to the investigation period, is supported by substantial evidence and according to law. The action is dismissed.

So ordered.