**CARLISLE TIRE AND RUBBER COMPANY, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 79–5–00748.**

United States Court of International Trade.

May 18, 1983.

Eugene L. Stewart and Terence P. Stewart, Washington, D.C., for plaintiff.

J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., David M. Cohen, Director, Commercial Litigation Branch, Washington, D.C. (Sheila N. Ziff, New York City, on the brief), for defendant.

*On Plaintiff's Supplementary Motion and Defendant's Supplementary Cross-Motion for Summary Judgment*

MALETZ, Senior Judge.

This case is one of first impression, posing the question whether a generally available tax deduction for accelerated depreciation of equipment is a bounty or grant within the meaning of section 303 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1303 (1976).[1] Plaintiff Carlisle Tire and Rubber Company (Carlisle), a domestic manufacturer of bicycle tires and tubes, challenges the countervailing duty redetermination of the International Trade Administration of the Department of Commerce (ITA) involving bicycle tires and tubes imported from the Republic of Korea. That redetermination was made pursuant to the remand of this court in *Carlisle Tire & Rubber Co. v. United States*, 2 CIT 97 (1981).

In its initial review of this matter this court found that the administrative record did not "contain sufficient information to enable the court to determine or reasonably estimate the amount of benefits received by the Korean importers, ..." *Id.* at 102. However, in lieu of undertaking *de novo* judicial review—which was available prior to enactment of the Trade Agreements Act of 1979—the court instead remanded the matter to the ITA for a redetermination. *Id.* See *Carlisle Tire & Rubber Co. v. Unit-*

---

1. The redetermination which is the focus of this action was rendered under section 303 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1303 (1976), the law in effect prior to the Trade Agreements Act of 1979. That section provided in part:

Whenever any country ... shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, ... then upon the importation of such article or merchandise into the United States, ... there shall be levied and paid, in all such cases, in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant, however the same be paid or bestowed.

*ed States,* 1 CIT 352, 357–58, 517 F.Supp. 704, 708–09 (1981).

On March 3, 1982, the ITA submitted its redetermination in which Carlisle concurred save for three of the ITA's findings: (1) that Hung-A Industrial Co., Ltd. (Hung-A), a Korean manufacturer of bicycle tires and tubes, did not receive countervailable benefits under Article 51–1–1 of the Korean Corporation Tax Law, a provision permitting accelerated depreciation of equipment; (2) that Hung-A did not receive a bounty or grant under Article 51–1–4 of that same Tax Law which gives additional accelerated depreciation to those enterprises which maintain accurate business records; and (3) that the benefits received by Hung-A under two export-related reserve fund programs, while undisputably countervailable, were properly calculated by using Hung-A's opening balance for 1977. It is these programs which are the focus of Carlisle's supplementary motion and the ITA's supplementary cross-motion for summary judgment.

For the reasons that follow, the court concludes that the two accelerated depreciation programs under Articles 51–1–1 and –4 are not a bounty or grant within the meaning of section 303 of the Tariff Act of 1930 inasmuch as the benefits accorded under these programs are not preferential but rather are generally available to the entire business community of Korea. With regard to the export reserve fund programs, the present record before the court lacks a sufficient factual foundation as to Hung-A's

tax payment and accounting practices. Thus, the court is unable to ascertain whether the ITA's calculations were properly determined and, hence, neither party is entitled to judgment as a matter of law. *See* rule 56(d) of the rules of this court.[2] Accordingly, Carlisle's supplementary motion for summary judgment is denied, and the ITA's cross-motion for summary judgment is granted in part and denied in part.

## I

The court turns first to an examination of the accelerated depreciation available under Articles 51–1–1 and –4 of the Korean Corporation Tax Law. Under Article 51–1–1 machinery or equipment used directly for manufacturing may be depreciated by an additional 20% beyond that ordinarily allowed under Korean law, provided the machinery or equipment is used at least 12 hours daily.[3] The tax benefit program under Article 51–1–4 likewise permits so-called "green returns" corporations to take an additional 20% depreciation beyond that normally allowed. (Green is the color of the tax return form.) Enterprises may take advantage of the "green return" program if they have had a history of maintaining accurate business records,[4] including the filing of accurate tax returns.

In its redetermination the ITA found that Hung-A had availed itself of the benefits under Articles 51–1–1 and –4. However, the ITA concluded that "[s]ince the programs under Article 51–1–1 and 51–1–4

---

**2.** Since this action is a *de novo* proceeding, *see Carlisle Tire & Rubber Co. v. United States,* 1 CIT 352, 357–58, 517 F.Supp. 704, 708–09 (1981), the full panoply of discovery procedures is available. In view of this consideration, a second remand is not only unnecessary but would further delay an already extensively protracted action.

**3.** Carlisle contends that in light of this 12-hour-per-day requirement the tax benefits under Article 51–1–1 are not generally available. This argument proves too much, however, for every tax benefit necessarily provides for minimum conditions which must be met before a taxpayer can qualify for it. This fact alone cannot mean that the benefits available under a tax provision are not generally available. Nor is

the 12-hour-per-day requirement so conditional that it makes Article 51–1–1 a preferential benefit.

**4.** Carlisle argues that the "green returns" benefit of Article 51–1–4 is not generally available because, in the words of the translated text of that law, "[t]he Greens Returns Corporations shall be treated differently in comparison with normal corporations." However, this statement is nothing more than a truism, since any business which satisfies the conditions for taking a tax deduction is *ipso facto* differently circumstanced from businesses which do not. This fact does not derogate from the general availability of the deduction. *See* note 3, *supra.*

are available to all manufacturers they are not preferential and are not bounties or grants." Thus, in the view of the ITA, a condition precedent to finding that a domestic program provides a bounty or grant is that the program give an advantage to one or more industries vis-a-vis other industries within the same country.

Carlisle is of the diametrically opposite view. It argues that benefits from government programs are countervailable even if they are generally available on a nonpreferential basis. It bases this contention on what it considers to be a plain reading of the words "bounty or grant" contained in section 303, concluding that Congress intended to cast its net broadly in order to catch all subsidies, export as well as domestic, without restriction. According to Carlisle, Congress expressed in unequivocal words its direction that *all* bounties or grants on manufacture or production be offset by means of countervailing duties in the amount of the net bounty or grant.

For its part the ITA counters that no generally available domestic program has ever been countervailed as a section 303 bounty or grant. Given this situation, the ITA concludes, there exists a longstanding administrative practice which should not be disturbed, citing *Zenith Radio Corp. v. United States,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978).

## II

While it is true that no generally available domestic subsidy has ever been countervailed, this glosses over the fact that this issue has never been directly considered either administratively or judicially.[5] The lack of opportunity to address the question whether a generally available domestic program is a section 303 bounty or grant is hardly synonymous with a longstanding and consistent administrative practice. Notwithstanding the absence of such a long-

standing practice, the court nevertheless agrees that generally available domestic tax benefits are not bounties or grants within the meaning of section 303 for at least three reasons: the deference due an agency's interpretation of the statute it is charged with administering, the absurd consequences which would flow from adoption of Carlisle's interpretation of section 303, and recent congressional pronouncements which show that section 303 was not intended to reach generally available domestic subsidies.

### A

■ First, in connection with the interpretation given a statute by the agency charged with its administration, it is basic that a court should defer to such interpretation, provided it is reasonable. *See, e.g., Zenith Radio Corp. v. United States,* 437 U.S. at 450, 98 S.Ct. at 2445; *Train v. Natural Resources Defense Council,* 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). In addressing the question of reasonableness the court notes that nowhere in the legislative history of section 303 is there a definition of "bounty or grant". From this it has been inferred that Congress consciously refrained from spelling out the precise criteria for determining what constitutes a bounty or grant, but rather intended that the metes and bounds of that term be staked out judicially and through administrative practice. *United States v. Zenith Radio Corp.,* 64 CCPA 130, 140 & n. 14, C.A.D. 1195, 562 F.2d 1209, 1217 & n. 14 (1977), *aff'd,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978). In the case of domestic subsidies the ITA has here interpreted "bounty or grant" as connoting some special or comparative advantage conferred upon an industry or group of industries and not available to all manufacturers and producers within a given country. Absent an

---

**5.** The ITA has cited one instance where a generally available domestic program was not countervailed, *Countervailing Duty Investigations on Certain Steel Mill Products from Belgium,* 47 Fed.Reg. 39304 (Sept. 7, 1982). How-

ever, that case was decided under the Trade Agreements Act of 1979 and then some six months after the redetermination in the instant case.

industry-specific or regional preference, the ITA contends, there can be no bounty or grant as that term is used in section 303.

■ The court agrees with the ITA's interpretation of section 303. Support for this position can be found, first of all, in the case law where a bounty or grant has been defined as a "special advantage," *Nicholas & Co. v. United States,* 7 Ct.Cust.App. 97, 107 (1916), *aff'd,* 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919), "an additional benefit" or "valuable privilege" conferred upon a "class of persons". *Downs v. United States,* 113 F. 114, 147 (4th Cir.1902), *aff'd,* 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903). Secondly, lexicons have defined a "bounty" as "[a] grant or subsidy to encourage an industry", and "grant" as a "tract of land, a monopoly, or the like, granted by the government"—both suggesting preferential treatment. Webster's New Int'l Dictionary 317, 1089 (2d ed. 1956).

Furthermore, although no decision of this court has directly passed on this specific question, several cases suggest that at a minimum either a regional or industry preference be present in order for a bounty or grant to exist. *See, e.g., ASG Industries, Inc. v. United States,* 67 CCPA 11, C.A.D. 1237, 610 F.2d 770 (1979); *ASG Industries, Inc. v. United States,* 67 CCPA 31, C.A.D. 1238, 610 F.2d 785 (1979); *ASG Industries, Inc. v. United States,* 82 Cust.Ct. 101, C.D. 4794, 467 F.Supp. 1200 (1979); *Michelin Tire Corp. v. United States,* 2 CIT 143 (1981); *Macalloy Corp. v. United States,* 1 CIT 199 (1981).[6] All in all, the court must conclude that the ITA's interpretation here is reasonable.

### B

What is more, adoption of Carlisle's literal view that generally available benefits are a bounty or grant would, if taken to its logical extreme, lead to an absurd result. Thus, included in Carlisle's category of countervailable benefits would be such things as public highways and bridges, as

well as a tax credit for expenditures on capital investment even if available to all industries and sectors. As observed by one commentator in the context of general domestic subsidies:

> These [types of generally available] subsidies have such a widespread effect on production that countervailing duties, were they allowed in such cases, could be imposed on almost every product which enters international commerce. Moreover, measurement of the exact extent of the net subsidy falling on any given product line would be unusually difficult. In any given case the amount of offsetting duty levied could be quite arbitrary.

Barcelo, *Subsidies and Countervailing Duties—Analysis and a Proposal,* 9 L. & Pol'y in Int'l Bus. 779, 836 (1977) (footnote omitted). To suggest, as Carlisle implicitly does here, that almost every import entering the stream of American commerce be countervailed simply defies reason. Moreover, in such a circumstance the burden that would be placed on the administering authority would be overwhelming, representing far more than mere administrative inconvenience.

Also, there would be the well-nigh insurmountable problem of arbitrary administration of the countervailing duty laws which would result from adoption of Carlisle's literal reading. For example, how could the benefit to industry in general accruing from construction of a public highway be fairly calculated? What would be the dollar value to the private sector of governmental research and development programs? Not only would accurate calculation of such benefits be difficult in the extreme, doing so in a reasoned and evenhanded manner would be next to impossible.

■ If a literal reading of a statute leads to an absurd conclusion, it is to be rejected. *United States v. Bryan,* 339 U.S. 323, 338, 70 S.Ct. 724, 734, 94 L.Ed. 884 (1950); *Asahi Chemical Industry Co. v.*

---

**6.** A regional development program is by its very nature preferential rather than general in scope since it favors that class or group of

enterprises doing business within the region over those enterprises situated outside of it.

*United States,* 4 CIT ——, 548 F.Supp. 1261 (1982). "No rule of construction necessitates ... acceptance of an interpretation resulting in patently absurd consequences." *United States v. Brown,* 333 U.S. 18, 27, 68 S.Ct. 376, 380, 92 L.Ed. 442 (1948). And taken to its logical extreme, Carlisle's interpretation of the term "bounty or grant" would lead to just that.

While Carlisle's position might have had some appeal in the early days of the countervailing duty law—a time when laissez faire was the guiding economic principle of government—its argument fails to appreciate modern day realities. In the wake of the Great Depression government after government in the West relegated Adam Smith and his "invisible hand" to the history books in favor of Keynesian and other interventionist economic policies. The pure market economy is today a mere theoretical model. It is safe to say that there is now no government professing to adhere to the private-enterprise system which does not to an ever increasing extent insinuate itself into the macroeconomics of a country. *See* M. & R. Friedman, Free to Choose 1–2, 70–71 (1980). *See generally* 6 Encyclopaedia Britannica 275–77 (15th ed. 1982).

■ Given these considerations the court must perforce reject Carlisle's interpretation which would equate a generally available benefit with a bounty or grant.

**C**

■ Having concluded that the term "bounty or grant" does not include generally available benefits, the court turns finally to a consideration of the Trade Agreements Act of 1979 for the additional light it sheds on this question. In enacting the Trade Agreements Act of 1979 Congress specifically provided that the new statutory term "subsidy" has the same meaning as the term "bounty or grant" found in section 303. Section 771(5) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677(5) (Supp. IV 1980). *See also* S.Rep. No. 249, 96th Cong., 1st Sess. 84 (1979) U.S.Code Cong. & Admin.News, pp. 381, 470 ("The definition of 'subsidy' is intended to clarify that the term has the same meaning which administrative practice and the courts have ascribed to the term 'bounty or grant' under section 303 of the Tariff Act of 1930, ...."). Significantly, section 771(5) lists several examples of domestic subsidies which are countervailable, but conditions these examples with the proviso that they be furnished "*to a specific enterprise or industry, or group of enterprises or industries.*" 19 U.S.C. § 1677(5)(B) (emphasis added).

It is true that the views of a subsequent Congress cannot override the unmistakable intent of the enacting one, *Teamsters v. United States,* 431 U.S. 324, 354 & n. 39, 97 S.Ct. 1843, 1864 & n. 39, 52 L.Ed.2d 396 (1977), and form a hazardous basis for inferring the intent of an earlier one, *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960). Nevertheless, such views are entitled to some weight, particularly when the precise intent of the enacting Congress is obscure. *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 596, 100 S.Ct. 800, 813, 63 L.Ed.2d 36 (1980). Here Congress' intent in the Trade Agreements Act of 1979 to limit a "bounty or grant" to those subsidies which are preferential in nature underscores the court's earlier conclusion that generally available benefits are not a section 303 bounty or grant.

**III**

For all the foregoing reasons, Carlisle's supplementary motion for summary judgment is denied, and the ITA's supplementary cross-motion for summary judgment is granted in part and denied in part.