**CABOT CORPORATION, Plaintiff,**

v.

**UNITED STATES, Defendant,**

**Hules Mexicanos, S.A., and Negromex, S.A., Defendant–Intervenors.**

Court No. 86–09–01109.

United States Court of International Trade.

July 21, 1988.

Stewart and Stewart (Eugene L. Stewart, Terence P. Stewart, D. Scott Nance, Geert De Prest, and William A. Fennell, Washington, D.C., on the motion), for plaintiff.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., Dept. of Justice (Sheila N. Ziff, Washington, D.C., on the motion), for defendant.

Rogers & Wells (Eugene T. Rossides, Washington, D.C., on the motion), for defendant-intervenors.

## MEMORANDUM OPINION

CARMAN, Judge:

Plaintiff moves pursuant to Rule 56.1 of the rules of this Court for judgment on the agency record. Plaintiff challenges the final affirmative determination by the United States International Trade Administration (ITA) in the first administrative review in Carbon Black From Mexico, 51 Fed.Reg. 30385 (Aug. 26, 1986). The administrative review covered the period April 8, 1983 to September 30, 1983. It was completed pursuant to section 751 of the Tariff Act of 1930 [the Act], as amended, 19 U.S.C. § 1675 (1986) [751 review].

Plaintiff contends the ITA's determination is unsupported by substantial evidence

on the record or otherwise not in accordance with law within the meaning of section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(b)(1)(B) (1982). As its principal contention, plaintiff asserts the decision in *Cabot Corp. v. United States*, 9 CIT 489, 620 F.Supp. 722 (1985), *appeal dismissed*, 788 F.2d 1539 (Fed.Cir. 1986), *vacated in part* (CIT Nov. 20, 1986) [*Cabot I*] collaterally estops the ITA from arguing that the nonconforming approach taken by it was correct.

The defendant United States and the defendant-intervenors oppose the motion for judgment on the agency record. They urge that the decision in *Cabot I* has neither collateral estoppel nor *stare decisis* effect. The defendant and intervenors request a remand, however, solely for the purpose of recalculating the benefits conferred by the FOMEX and FONEI loans [1] with the use of effective rather than nominal interest rates.

The Court finds that while collateral estoppel does not apply against the government in this 751 review, the principles of *Cabot I* and *PPG Industries, Inc. v. United States*, — CIT —, 662 F.Supp. 258 (1987), *appeal docketed*, No. 88–1175 (Fed. Cir. Dec. 28, 1987) apply perforce to the like facts of this case. As was held in the

*Cabot I* and *PPG* decisions, "general availability" is not the prevailing standard under 19 U.S.C. § 1303 and 1677(5) (1982). To ensure that these statutory requirements are met, the Court directs a remand for a redetermination consistent with *Cabot I* and *PPG*.

## FACTS

The countervailing duty investigation in this case culminated with the publication by the ITA of a final affirmative determination and order on carbon black [2] from Mexico. 48 Fed.Reg. 29564 (June 27, 1983). That determination was the subject of the Court's decision in *Cabot I*.

In *Cabot I*, the Court held that "the generally available benefits rule as developed and applied by the ITA is not an acceptable legal standard for determining the countervailability of benefits under section 1303." *Cabot I*, 9 CIT at 498, 620 F.Supp. at 732. The Court ordered a remand for further investigation and redetermination regarding Mexico's provision of carbon black feedstock [CBFS] and natural gas at government-set rates. 620 F.Supp. at 734.

At the time the Court issued the decision in *Cabot I*, the 751 review which is the subject of this action was proceeding. Fol-

---

1. FOMEX (Fund for the Promotion of Exports of Mexican Manufactured Products) is a governmental trust which provides low interest loans to Mexican companies to promote the manufacture and sale of exported products. *See* 47 Fed.Reg. 7866, 7867 (Feb. 23, 1982). FONEI (Fund for Industrial Development) "is a specialized fund, administered by the Bank of Mexico, which grants long-term credit at below-market rates for the creation, expansion or modernization of enterprises in order to foster the efficient production of industrial goods, the production of goods capable of competing in the international market, and industrial decentralization." *See* 48 Fed.Reg. 43063, 43065 (Sept. 21, 1983).

2. In *Cabot I*, the Court defined carbon black as: elemental carbon with incidental or planned surface oxidation that is formed under the controlled cracking, heating and quenching of a petroleum derivative feedstock, commonly referred to as carbon black feedstock. Carbon black is used primarily in the rubber industry, but is also used in the production of paints, inks, plastics and carbon paper.

Carbon black feedstock, along with natural gas and water, is essential for the production of carbon black. The feedstock is one of many types of petroleum products obtainable from crude oil, but results relatively early in the refining process. After crude oil is heated to cause a breakdown into its constituent parts, one of the constituent parts, "gas oil" or "heavy gas oil" is refined further in a catalytic cracker. In the typical catalytic cracking process, a catalyst is introduced into the heating treatment of the gas oil. At extremely high temperatures and pressures, the gas oil breaks down—cracks—and yields gasoline. Catalytic cracking is a crucial process in the production of gasoline and the prime goal is to produce gasoline.

*Cabot Corp.*, 9 CIT at 491, 620 F.Supp. at 727 (citing 14 Encyclopedia Britannica *Petroleum Refining* 183 (15th ed. 1982). For a general discussion of Mexico's National Industrial Development Plan [NIDP] and its interaction with Mexico's carbon black industry, *see Cabot Corp.*, 9 CIT at 493, 620 F.Supp. at 728.

lowing an appeal which was dismissed as premature, 788 F.2d 1539, the ITA moved for an extension of more than 150 days in which to file the remand redetermination.[3] A few days before the final results of the 751 review were published in the Federal Register, the government moved to vacate the remand order in *Cabot I* and stay the proceedings pending the outcome of the motion to vacate. The Court granted the motion to vacate and affirmed final judgment except for those matters for which the action was remanded in *Cabot I*. *See* Order dated Nov. 20, 1986.

The 751 review which is the subject of this action covered the period April 8, 1983 to September 30, 1983. One of the primary issues raised in the review concerned the provision of CBFS in Mexico. CBFS is provided by Petroleos Mexicanos [PEMEX], the government-controlled petroleum monopoly in Mexico. It is sold to only two producers of Mexican carbon black at prices not offered to any non-Mexican companies and at prices substantially below those elsewhere in the world. During the period under review, Mexican CBFS was sold to Mexican carbon black companies for $16 a ton in the second quarter of 1983 and $27 a ton in the third quarter. During the same timeframe, CBFS sold for approximately $130 and $136 a ton respectively in the United States. Public Document at 823, *Cabot Corp. v. United States* (No. 86-09-01109) [Pub.Doc.]. The import price of CBFS to the European Community [EC] during the period of review was approximately $151 per ton while the export price from the EC was $156 per ton. Pub.Doc., *supra*, at 952. Plaintiff's Brief in Support of Motion for Judgment on Agency Record at 5, *Cabot Corp. v. United States*, (No. 86-09-01109) [Plaintiff's Brief].

In the preliminary determination, the ITA determined that there were too few users of CBFS to find it was "generally available." Pub.Doc., *supra*, at 677-78. The ITA therefore proceeded to determine whether or not CBFS was preferentially priced to carbon black producers. *Id.* at 678.

Because CBFS was used by only one industry in Mexico, the ITA was unable to utilize its standard preferentiality test. In accordance with this test, the ITA would have examined the PEMEX price of CBFS to carbon black producers to determine if this price was more favorable than the PEMEX price to other purchasers of CBFS in Mexico. *Id.* The ITA instead compared the PEMEX price of CBFS to the price charged by PEMEX for a generally available "similar or related good."

Finding that No. 6 fuel oil and CBFS were related products, and that a correlation existed between the prices of these two products, *id.* at 679, the ITA selected No. 6 fuel oil as the most appropriate "similar or related good." Adjustments were made to reflect the differences in costs between the two products. *Id.* at 679-80.

After examining the price of No. 6 fuel oil, the ITA preliminarily determined that CBFS was not preferentially priced to carbon black producers and therefore did not confer a countervailable subsidy. *Id.* at 680. In the final determination, the ITA employed the same methodology used in the preliminary determination except that it used quarterly price differentials between CBFS and No. 6 fuel oil instead of average differentials for the entire period. *See id.* at 1413. The ITA found a subsidy of 1.90 percent *ad valorem.* *Id.*

Concerning the provision of natural gas, the ITA preliminarily determined that natural gas was available on a non-specific basis. *Id.* at 676. The ITA therefore found that the differential between high export prices and low domestic prices of natural gas did not constitute a domestic subsidy. *Id.* at 677. The ITA's conclusions regarding the non-countervailability of natural gas apparently remained unchanged in the final determination. The ITA also found that three FOMEX export loans had been inadvertently excluded from the preliminary results. *Id.* at 1405. After including these loans, the ITA found the total FO-

---

**3.** Although the agency requested an extension of more than 150 days in which to file the remand results, this extension was reduced upon agreement among the parties to 135 days.

MEX benefit to be 0.52 percent *ad valorem*. *Id.* The ITA found the total bounty or grant during the period of review to be 3.18 percent *ad valorem*. *Id.* at 1415.

Plaintiff contends that since the agency failed to comply with the requirement of the countervailing duty law as articulated in *Cabot I*, the ITA's valuation of the extent of the benefit from the provision of CBFS to Mexican producers and its conclusions regarding natural gas are not supported by substantial evidence or are otherwise contrary to law. In the plaintiff's view, the Court's decision in *Cabot I* collaterally estops the agency from arguing that the non-conforming approach utilized by it to measure the subsidy from the provision of CBFS and to determine the existence of a subsidy from the provision of natural gas was correct.

In addition, plaintiff contends that the ITA erroneously limited its examination of CBFS pricing to a consideration of whether such pricing was "preferential" within the agency's interpretation of 19 U.S.C. § 1677(5)(B)(ii). Plaintiff urges that the ITA's interpretation of what constitutes a good or service at a preferential rate was unsupported by substantial evidence and was otherwise contrary to law.

Plaintiff argues that the ITA should have examined other alternatives for determining the extent of preferentiality. According to the plaintiff, the ITA should have utilized U.S. export prices of CBFS to Mexico during 1981–1983 or U.S. or world prices for CBFS as the best measure of preferentiality. Plaintiff's Brief, *supra*, at 15–16.

Plaintiff maintains the ITA incorrectly selected No. 6 fuel oil as a "similar or related" product. In the plaintiff's view, the ITA should have used substitute products for CBFS available within Mexico instead of "similar or related" products. *Id.* at 10–15.

Plaintiff contends the ITA improperly failed to obtain cost of production information from PEMEX for CBFS. Plaintiff urges this failure to obtain information amounts to the kind of failure to investigate that was held to be an abuse of discretion in *Timken Co. v. United States*, ——

CIT ——, ——, 630 F.Supp. 1327, 1336–39 (1986).

Plaintiff also maintains that the ITA incorrectly utilized nominal interest rates to compute the benefit to Mexican carbon black exporters from FOMEX and FONEI loans. Plaintiff asserts that "[b]y using nominal rates, and not taking into consideration the true cost of commercial borrowing, the agency seriously understated the benefit accorded to Mexican carbon black producers." Plaintiff's Brief, *supra*, at 21.

Finally, plaintiff criticizes the government for its undue haste in completing the 751 review so that it could move to have the remand order vacated. In its haste, plaintiff urges, the government failed to investigate CBFS cost of production and interest rates, and failed to properly review comments submitted on the agency's proposed methodology. *Id.* at 24–28.

Defendant United States contends the decision in *Cabot I* has neither collateral estoppel nor *stare decisis* effect in the first 751 review. In the defendant's view, the ITA properly determined that the provision of natural gas by the Mexican government at a controlled price did not constitute a countervailable subsidy. Defendant further urges that the ITA properly measured the preference received by the carbon black producers from the provision of carbon black feedstock at controlled prices. Defendant urges the methodology utilized by the agency to determine the extent of the preference accorded the carbon black producers was reasonable and in accordance with the law.

Defendant urges the ITA properly selected No. 6 fuel oil as a "similar or related good." Defendant further contends that the application of a world price benchmark would have been impractical and unreasonable. Finally, the defendant contends, the ITA acted properly in issuing the final results of the review prior to the statutory deadline. The defendant-intervenor essentially concurs with the defendant's position.

## DISCUSSION

### A. *Standard of review*

A review of a final determination under 19 U.S.C. § 1675 is not *de novo* but must

be made upon the administrative record. *Luciano Pisoni Fabbrica Accessori v. United States,* — CIT —, —, 640 F.Supp. 255, 256 (1986). In reviewing the record, the Court must not permit the agency, under the guise of lawful discretion or interpretation, to contravene or ignore the intent of Congress. *Ceramica Regiomontana, S.A. v. United States,* — CIT —, —, 636 F.Supp. 961, 966 (1986), *aff'd,* 810 F.2d 1137 (Fed.Cir.1987) (citing *Chevron U.S.A., Inc. v. Natural Res.Def. Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), *reh'g denied,* 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984); *Board of Governors, Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986)). The Court must hold unlawful any determination, conclusion, or finding found to be unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S. C. § 1516a(b)(1)(B) (1982). Substantial evidence has been held to be more than a "mere scintilla." Such evidence must be sufficient to reasonably support a conclusion. *Ceramica Regiomontana,* — CIT at —, 636 F.Supp. at 966.

Further, the agency's interpretation of the statute it administers is entitled to substantial weight. *American Lamb Co. v. United States,* 785 F.2d 994, 1001 (Fed.Cir. 1986) (citing *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450–51, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1964), *reh'g denied,* 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965)). The Court should not reject the agency interpretation unless there are compelling reasons why it should not be followed. *Wilson v. Turnage,* 791 F.2d 151, 156 (Fed. Cir.1986), *cert. denied,* 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986). As a "master of the subject," the agency is afforded considerable deference in the exercise of its expertise. *Consumer Prod. Div., SCM Corp. v. Silver Reed America, Inc.,* 753 F.2d 1033, 1039 (Fed.Cir.1985).

If Congress has not directly addressed a specific issue, the Court may not impose its own construction of the statute. Rather, the Court must decide if the agency's interpretation is based upon a permissible construction of the statute. *Chevron, U.S.A.,* 467 U.S. at 843, 104 S.Ct. at 2781.

In light of the above principles, the Court must now determine if the decision in *Cabot I* collaterally estops the ITA from using the "general availability test" in this case.[4]

### B. Collateral Estoppel

Under the doctrine of collateral estoppel[5] sometimes referred to as issue preclu-

---

**4.** The Court finds evidence that the ITA clearly applied the general availability rationale from the ITA's conclusion that: "[w]e continue to maintain that No. 6 fuel oil is a *generally-available* similar or related product to CBFS." 51 Fed.Reg. at 30386 (Aug. 26, 1986) (emphasis added). In analyzing the comments received by it, the ITA further stated:

> Cabot ... argues that (1) The Court of International Trade has held that the Department's general availability test is contrary to law; and (2) even if that were not the case, the Department under its own standards must determine that a benefit is generally available in fact as well as in name.
>
> *Department's position.* We believe that the test *is not contrary to law* but agree with Cabot that, in applying the specificity test for domestic subsidies, we must be concerned with both nominal and *de facto* availability. *Id.* (emphasis added).

**5.** Collateral estoppel is one of several doctrines that limit reconsideration of judicial decisions. While related, these doctrines reflect a distinct mix of policy considerations. These doctrines include *stare decisis,* law of the case, *res judicata,* collateral estoppel or issue preclusion, and full faith and credit. *See* 1B J. Moore, J. Lucas & T. Currier, Moore's Federal Practice ¶ 0.401 (2d ed. 1988) [1B Moore]. These doctrines are understood to mean the following:

> 1. *Stare decisis*: Provides that "a decision on an issue of law embodied in a final judgment is binding on the court that decided it and such other courts as owe obedience to its decisions, in all future cases." *Id.* at ¶ 0.402[1]. It is expected that "like facts will receive like treatment in a court of law.... [The court] may not disregard binding precedent absent an intervening Supreme Court or *en banc* circuit decision." *Flowers v. United States,* 764 F.2d 759, 761 (11th Cir.1985) (citations omitted). *Stare decisis* "plays an important role in orderly adjudication," and "serves the broader societal interests in evenhanded, consistent and predictable application of legal rules." *Thomas v. Washington Gas Light Co.,* 448 U.S. 261, 271, 100 S.Ct. 2647, 2655, 65 L.Ed.2d 757 (1980). In regard to this doctrine, Chief Judge Re has stated:

sion, issues which were actually and necessarily determined by a court of competent jurisdiction are treated as conclusive in a subsequent suit involving the parties to the prior litigation. *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.,* 723 F.2d 1566, 1569 (Fed.Cir.1983). The doctrine is applicable, however, only where the issue determined in the prior litigation has resulted in a final judgment on the merits. *Equitable Trust Co. v. CFTC,* 669 F.2d 269, 272 (5th Cir. 1982). Collateral estoppel does not apply unless the party against whom the earlier decision was made has had a full and fair opportunity to litigate the issue. *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 480–81, 102 S.Ct. 1883, 1896–97, 72 L.Ed.2d 262 (1982), *reh'g denied,* 458 U.S. 1133, 103 S.Ct. 20, 73 L.Ed.2d 1405 (1982). Although collateral estoppel once required mutuality

The decided case is said to establish a principle, and it is indeed a *principium,* a beginning, in the true etymological sense.... A principle is a fundamental assumption that does not foreclose further inquiry. As a point of departure or beginning, the common law judge affirms or asserts the pertinence of a principle extracted from the precedent found to be in point. He then proceeds to apply it by molding or shaping that principle to meet the needs of deciding the case at bar. The process of application, whether it results in an expansion or a restriction of the principle, is more than a mere gloss; it represents the judge's distinct contribution to the growth and development of the law.

Re, *Stare Decisis and the Judicial Process,* 79 F.R.D. 509, 510 (1979).

2. *Law of the Case:* This principle provides that the law applied in decisions at various stages of the same litigation become the governing principles at later stages. It is distinguishable from *stare decisis* which applies a binding precedent principle to a final judgment. 1B Moore, *supra,* ¶ 0.401. In *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed. 2d 318 (1983) the Court pointed out that unlike *res judicata,* law of the case is an amorphous concept, is directed to the court's discretion, and does not limit the tribunal's power.

3. *Res Judicata:* This doctrine applies when there is a valid judgment on the merits between the parties. Such a judgment operates as an absolute ban of a subsequent action of the same claim or demand between the same parties or those in privity with them. *NLRB v. United Technologies Corp.,* 706 F.2d 1254, 1259 (2nd Cir.1983). In considering the terms *res judicata,* collateral estoppel, and claim preclusion, the United States Court of Appeals for the Federal Circuit has adopted the following analysis:

of parties, that rule has been substantially modified in federal practice. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326–31, 99 S.Ct. 645, 649–52, 58 L.Ed.2d 552 (1979).

▪ In *Cabot I,* upon defendant United States' motion for vacatur of part of the court's decision, the court vacated the remand and ordered entry of a final judgment sustaining the final affirmative countervailing duty determination and order on carbon black from Mexico. The final judgment covered all matters except those for which the action had been remanded. *See Cabot I* (Order dated Nov. 20, 1986). While a final judgment entered, this judgment was only partial. This judgment also favored the government. There was therefore no appealable judgment on the merits from which the government could have obtained review.[6] The Court holds that since

we will be guided by the *Restatement (Second) of Judgments* (1982) which, in introductory note to § 13, provides the following statement:

The concepts developed in this Chapter are: merger—the extinguishment of a claim in a judgment for plaintiff (§ 18) bar—the extinguishment of a claim in a judgment for defendant (§ 19) and issue preclusion—the effect of the determination of an issue in another action between the parties on the same claim (direct estoppel) or a different claim (collateral estoppel) (§ 27). The term *"res judicata"* is here used in a broad sense as including all three of these concepts. When it is stated that "the rules of res judicata are applicable," it is meant that the rules as to the effect of a judgment as a merger or a bar or as a collateral or direct estoppel are applicable.

*Young Engineers v. United States Int'l Trade Comm'n,* 721 F.2d 1305, 1314 (Fed.Cir.1983).

4. *Collateral estoppel or issue preclusion—* (See infra text).

5. *Full Faith and Credit* is the term used to define what each state is constitutionally required to afford to the judicial proceedings of every other state. U.S. Const., art. IV, § 1. The purpose of this requirement is "to give transjurisdictional effect to the doctrine of res judicata, and within limits, to the doctrine of collateral estoppel." 1B Moore, *supra,* ¶ 0.401. It is a constitutional and statutory command made necessary by the multiplicity of jurisdictions in the federal system. *Id.*

6. If litigants were permitted to appeal decisions in which they were successful but dissatisfied with the lower court's reasoning, appellate courts would be unduly burdened and presumably asked to issue advisory opinions which

*Cabot I* culminated in a final judgment from which there was no effective appeal on the merits available to the defendant United States, collateral estoppel does not apply against the government in this 751 review.

It is nevertheless clear that the ITA applied "general availability" in making its determination in this case. See *supra* note 4. In an extensive opinion in *Cabot I*, the Court discussed the "general availability rule" and its validity under the countervailing duty laws. Although the Court vacated the order in *Cabot I*, the Court did not abrogate the legal reasoning and principles of *Cabot I*. The order was vacated because the completion of the first 751 review rendered moot the question of duty deposit rates which were set in the original countervailing determination. *See PPG Industries, Inc. v. United States*, —— CIT ——, ——, 660 F.Supp. 965, 973 (1987). While collateral estoppel does not apply to the outcome of this litigation, the reasoning of *Cabot I* applies perforce to the facts of this case. A substantial portion of the reasoning of *Cabot I* is therefore incorporated herein for convenience:

A. *Applicable Law: The Interplay Between Section 1303 and Section 1671.*

As the "direct descendant" of earlier countervailing duty laws, *Bethlehem Steel Corp. v. United States*, 7 CIT [339, 341], 590 F.Supp. 1237, 1239 (1984), section 1303 applies to countervailing duty investigations "[e]xcept in the case of an article or merchandise which is the product of a country under the Agreement." 19 U.S.C. § 1303(a)(1). For articles from countries under the Agreement, however, section 1677(5) applies. Mexico was not a country under the Agreement during the period of this investigation, therefore section 1303 is the applicable statute. The ITA stated in its determination, nevertheless, that "[w]hile [the] investigation is governed procedurally by section 303 of the Act, the analysis of programs is based on Title VII of the Act ...," and therefore applied § 1677(5)(B). 48 Fed.Reg. at 29,566. This position is

not supported by a careful examination of the statutes and the decisions of this court.

Section 1677(5) states first that "subsidy" has the same meaning as "bounty or grant." Thus there is "complete harmony and continuity between the two provisions." *Bethlehem Steel Corp. v. United States*, 7 CIT [at 341], 590 F.Supp. [at 1240] (1984). In section 1677(5), added to the Tariff Act of 1930 by the [Trade] Agreements Act of 1979, Pub.L. No. 96–39, § 101, 93 Stat. 144, 151 (1979), Congress enumerated certain countervailable practices. This did not imply a repeal of section 1303 and its interpretation.[7] Thus, the same analysis applies regardless of which statute controls, and the law defining the term bounty or grant informs the interpretation of the term subsidy. Section 1677(5) does not subsume "bounty or grant."

In sum, section 1303 supplies the substantive law in this case. The administrative, legislative, and judicial pronouncements pertaining to section 1303 are accordingly apt. The Court may nevertheless refer to 19 U.S.C. § 1677(5) in interpreting section 1303. *See Carlisle*, 5 CIT [229], 564 F.Supp. 834; *Bethlehem*, 7 CIT 339, 590 F.Supp. 1237.

B. *The Legal Standard: Countervailability of Generally Available Benefits*

The chief issue presented to the Court is whether benefits that are available on a nonpreferential basis—that is, benefits obtainable by any enterprise or industry—can be bounties or grants within the meaning of section 1303 and therefore countervailable. Since any industrial user in Mexico could purchase carbon black feedstock and natural gas at the same price (disregarding the regional discount, *see infra* p. 728), the ITA viewed PEMEX's provision of these inputs at well below world market prices as not constituting a countervailable practice. 48 Fed.Reg. at 29,566. The ITA view was based on the "generally available benefits rule," which has evolved within the administrative agency and was

would be unconstitutional. *See* U.S. Const., art.   III, § 2.

adopted by the court in *Carlisle Tire & Rubber Co. v. United States*, 5 CIT 229, 564 F.Supp. 834 (1983). Two other decisions of this court, however, have rejected the rule as contrary to the countervailing duty statutes, most specifically section 1303, and as therefore unlawful. *Agrexco, Agricultural Export Co. v. United States*, 9 CIT 40, 604 F.Supp. 1238 (1985); *Bethlehem Steel Corp. v. United States*, 7 CIT 339, 590 F.Supp. 1237 (1984). This Court thus faces considerable controversy regarding the rule that generally available benefits provided within the relevant jurisdiction are not countervailable.

The generally available benefits rule as articulated by the defendant is essentially that benefits available to all companies and industries within an economy are not countervailable subsidies. Defendant's conclusions are primarily drawn from 19 U.S.C. § 1677(5)(B), which refers to countervailable domestic subsidies as being provided to "a *specific* enterprise or industry, or group of enterprises or industries...." (emphasis added). Thus, argues defendant, benefits "generally available" to all enterprises or industries are not subsidies under section 1677(5)(B), and therefore do not fall within the meaning of "bounty or grant" as used in section 1303. Defendant bolsters its interpretation by citing *Carlisle Tire & Rubber Co. v. United States*, 5 CIT 229, 564 F.Supp. 834.

In *Carlisle*, the court upheld the ITA's interpretation of section 1303 as being reasonable. *Id.* at 233, 564 F.Supp. at 838. The court relied in part on older case law which described a bounty or grant as a "special advantage," citing *Nicholas & Co. v. United States*, 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919), or "an additional benefit" conferred upon a "class of persons," citing *Downs v. United States*, 187 U.S. 496, 501, 23 S.Ct. 222, 223, 47 L.Ed. 275 (1903). Apparently the ITA and the court in *Carlisle* view the noncountervailability of generally available benefits as the opposite side of the coin from the countervailability of benefits conferred upon a specific class.

There is a distinction, however, which has not been clearly deciphered by the ITA or in prior judicial opinions, but which disrupts the apparent symmetry of the two sides of the coin.

The distinction that has evaded the ITA is that not all so-called generally available benefits are alike—some are benefits accruing generally to all citizens, while others are benefits that when actually conferred accrue to specific individuals or classes. Thus, while it is true that a generalized benefit provided by government, such as national defense, education or infrastructure, is not a countervailable bounty or grant, a generally available benefit—one that may be obtained by any and all enterprises or industries—may nevertheless accrue to specific recipients. General benefits are not conferred upon any specific individuals or classes, while generally *available* benefits, when actually bestowed, may constitute specific grants conferred upon specific identifiable entities, which would be subject to countervailing duties.

The court in *Carlisle* recognized the absurdity of a rule that would require the imposition of countervailing duties where producers or importers have benefited from general subsidies, as "almost every product which enters international commerce" would be subject to countervailing duties.[8] *See* 5 CIT at 234, 564 F.Supp. at 838 (citing Barcelo, *Subsidies and Countervailing Duties—Analysis and a Proposal*, 9 L. & Pol'y in Int'l Bus. 779, 836 (1977)). Alternatively, the court in *Bethlehem* recognized the absurdity of a law that would transform an obvious subsidy into a non-countervailable benefit merely by extending the availability of the subsidy to the entire economy. 7 CIT at 345, 590 F.Supp. at 1242. Thus, although a bounty or grant is preferential in nature, bestowed upon an individual class, the generally available benefits rule as developed and applied by the ITA is not an acceptable legal standard for determining the countervailability of benefits under section 1303.

The appropriate standard focuses on the *de facto* case by case effect of benefits provided to recipients rather than on the nominal availability of benefits. The case must therefore be remanded for further investigation and redetermination. The definition of "bounty or grant" under section 1303 as intended by Congress remains as it is embodied in the case law and later affirmed by Congress in section 1677(5). This definition requires focusing only on whether a benefit or "competitive advantage" has been actually conferred on a "specific enterprise or industry, or group of enterprises or industries." In the case before the Court, the *availability* of carbon black feedstock and natural gas at controlled prices does not determine whether the benefits actually received by these two carbon black producers are countervailable subsidies.

The programs appear to effect specific quantifiable provisions of carbon black feedstock and natural gas to specific identifiable enterprises. That additional enterprises or industries can participate in the programs, whether theoretically or actually, does not destroy the programs as subsidies. The programs are apparently available to all Mexican enterprises, but in their actual implementation may result in special bestowals upon specific enterprises.

Once it has been determined that there has been a bestowal upon a specific class, the second aspect of the definition of bounty or grant requires looking at the bestowal and determining if it amounts to an additional benefit or competitive advantage. If so, the benefit might fit within one of the illustrative examples of 19 U.S.C. § 1677(5)(B). The ITA, however, prematurely concluded that "the provision of carbon black feedstock and natural gas clearly involves the provision of goods within the meaning of subsection (ii)," 48 Fed.Reg. at 29568, that is, the subsidy example of providing goods or services at preferential rates. The ITA asserted, "[t]he standard contained in subsection (ii) is [']preferential,' which normally means

only more favorable to some within the relevant jurisdiction than to others within the jurisdiction." 48 Fed.Reg. at 29,-568. Thus, concluded the ITA, "even if carbon black feedstock and natural gas were not generally available, we would not find this rate to be a subsidy, because this rate is not preferential...." *Id.*

The ITA has engaged in a tautology, merely extending its generally available benefits rule into the illustrative example of subsection (ii). Although preferential pricing clearly is a countervailable subsidy, subsection (ii), as only one such example of a subsidy, does not include all pricing programs constituting subsidies. The ITA's attention must therefore be directed to the broader question of whether the Mexican pricing programs for carbon black feedstock and natural gas are additional benefits or competitive advantages within the scope of section 1303.[9]

---

[7] By leaving the § 1303 term "bounty or grant" undefined, Congress intended that the "metes and bounds of that term be staked out judicially and through administrative practice." *Carlisle Tire & Rubber Co. v. United States*, 5 CIT 229, 233, 564 F.Supp. 834, 837 (1983) (citing *United States v. Zenith Radio Corp.*, 64 CCPA 130, 140 & n. 14, 562 F.2d 1209, 1217 & n. 14 (1977), *aff'd*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978).

[8] A chief concern of the court in *Carlisle* was avoiding the absurd result of countervailing "such things as public highways and bridges, as well as a tax credit for expenditures on capital investment even if available to all industries and sectors." *Carlisle*, 5 CIT at 233, 564 F.Supp. at 838. The court's concern seemed directed toward "general subsidies that most governments confer such as national defense, government-subsidized education and infrastructure, and sufficient public health and agricultural extension programs." G. Bryan, *Taxing Unfair International Trade Practices* 297 (1980). Such subsidies are distinguished from selective subsidies, examples of which are outlined in 19 U.S.C. § 1677(5). *Id.*

"General subsidies" may also be looked at in economic terms as provisions of *public goods*. Governments provide many such goods and services because of the inability of the price system to effectively provide these goods, which tend to be indivisible and collectively consumable by all citizens whether they pay for them or not. E. Mansfield, *Economics Principles, Decisions* 68, 74–78 (4th ed. 1983). This public good

analysis is in alignment with the analysis under § 1303. A public good provided by government benefits society in a collective manner. It is not conferred upon any specific enterprise or industry.

With respect to the tax laws such as credits, accelerated methods of depreciation, and special depreciation recapture rules, issues may be more complicated. Each program must therefore be examined on a case-by-case basis to determine if the benefit accrues to specific beneficiaries or generally to society.

[9] Plaintiff argues that a price below the world market price is a per se countervailable benefit. The matter is more complex. The availability of inputs at low prices to foreign producers may be the result of various non-countervailable factors such as comparative advantage. *See* T. Pugel, *The Fundamentals of International Trade and Investment*, in Handbook of International Business 1–2, 4 (I. Walter ed. 1982). The facts of this case indicate that the Mexican carbon black producers have located themselves (although perhaps pursuant to the NIDP) to take advantage of available carbon black feedstock with specific qualities. This arrangement might allow PEMEX to sell a byproduct which would otherwise go unsold. Thus, prices below the world market price or the export price may simply be the result of a symbiotic industrial relationship. Further, PEMEX's refusal to sell carbon black feedstock abroad to plaintiff might be on account of limited Mexican domestic supply.

On the other hand, "generally available" benefits are not necessarily the result of the exercise of comparative advantage. It cannot be concluded merely on the basis of nominal availability and absent further investigation that the prices of carbon black feedstock and natural gas as set by PEMEX are the result of factors such as excess supply and low production cost. *See contra* Note, *Upstream Subsidies and U.S. Countervailing Duty Law: The Mexican Ammonia Decision and the Trade Remedies Reform Act of 1984*, Law and Pol'y in Int'l Bus. 263, 291 & n. 126 (1985).

*Cabot Corp.*, 9 CIT at 495–99, 620 F.Supp. at 730–33.

■ The ITA's formulation of the general availability rule appears to be the result of an erroneous decision to paraphrase the applicable statute. It is never wise for courts or administrative agencies to paraphrase statutes. As the Court has held in both the *Cabot I* and *PPG* decisions, Congress intended § 1677(5) to be the definitive test of countervailable benefits. Whether or not a subsidy is generally available is only some evidence that a program is countervailable. It is not the only factor. All relevant factors must be properly examined by the agency to determine whether or not countervailing duties should be imposed. *See PPG Industries*, —— CIT at ——, 662 F.Supp. at 265. One might posit that the term "general availability" is synonomous with the phrase "provided to or required by government action to a specific enterprise or industry, or group of enterprises or industries." The Court observes, however, that there has been extensive litigation concerning "general availability" and a painstaking effort to articulate the applicable standard as specified by Congress. *See, e.g., Cabot I*, 9 CIT 489, 620 F.Supp. 722; *PPG Industries*, —— CIT ——, 662 F.Supp. 258; *Can–Am Corp. v. United States*, —— CIT ——, 664 F.Supp. 1444 (1987). While reference to these decisions would certainly be appropriate, the language of § 1677(5) is the primary determinant of congressional intent:

(5) **Subsidy.**—The term "subsidy" has the same meaning as the term "bounty or grant" as that term is used in section 1303 of this title, and includes, but is not limited to, the following:

. . . .

(B) The following domestic subsidies, if provided or required by government action to a *specific enterprise or industry, or group of enterprises or industries*, whether publicly or privately owned, and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise:

(i) The provision of capital, loans, or loan guarantees on terms inconsistent with commercial considerations.

(ii) The provision of goods or services at preferential rates.

(iii) The grant of funds or forgiveness of debt to cover operating losses sustained by a specific industry.

(iv) The assumption of any costs or expenses of manufacture, production, or distribution.

19 U.S.C. § 1677(5) (1982) (emphasis added).

Although the Court will normally accord substantial weight to the agency's interpretation of the statute it administers, *Ameri-*

*can Lamb,* 785 F.2d at 1001, "th[e] Court will not allow [the] agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute." *Ceramica Regiomontana,* —— CIT at ——, 636 F.Supp. at 966. Accordingly, this action is remanded to the ITA for a redetermination in accordance with this opinion.[7]

## CONCLUSION

Since all of the parties concur on the issue, the plaintiff's motion for a remand to the ITA for the purpose of recalculating the benefits conferred by FOMEX and FO-MEX loans is granted. The Court further holds that since the "general availability rule" as developed and applied by the ITA pervades the entire final affirmative determination, a remand for the purpose of reconsideration by the ITA of the 751 review determination in accordance with this opinion is appropriate.

7. With respect to the natural gas issue, it may well be that upon remand, the ITA's application of the specificity test in accordance with § 1677(5), *Cabot I,* and *PPG* will resemble the test employed by the agency in the preliminary 751 review determination. Because a "general availability" rationale pervades the entire final 751 review determination, however, the Court is unwilling to speculate.